FILED
2013 Nov-21  PM 04:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **JACQUELYN WEAVER,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **CIVIL ACTION NO. _____** |
| | * | |
| **THE NATIONAL BETTER LIVING** | * | |
| **ASSOCIATION, INC.; ALLIED** | * | |
| **HEALTH BENEFITS, INC.; THE** | * | |
| **UNITED STATES LIFE INSURANCE** | * | |
| **COMPANY IN THE CITY OF NEW** | * | |
| **YORK; ALBERT CORMIER** | * | |
| **SOLUTIONS, LLC; HEALTH LEAD** | * | |
| **SYSTEMS, INC.,** | * | |
| | * | |
| **Defendants.** | * | |

### CLASS ACTION COMPLAINT

COMES NOW, Plaintiff in the above-captioned matter, on behalf of herself and a class of similarly situated persons as defined herein, and hereby files the following Class Action Complaint against Defendants The National Better Living Association, Inc.; Allied Health Benefits, Inc.; The United States Life Insurance Company in the city of New York; Albert Cormier Solutions, LLC; and Health Lead Systems, Inc., and alleges as follows:

### I. NATURE OF THIS ACTION

1.

This action challenges a deceptive and predatory "association plan" insurance scam designed to enrich Defendants at the expense of vulnerable consumers seeking individual health insurance. The scheme is carried out by setting up a dubious "group association," which is nothing more than a subterfuge to evade regulatory over-sight. Then, as part of the association's purported "group benefit," the Defendants deceptively market and sell certain worthless, junk insurance under the

auspices of comprehensive, major medical insurance to consumers who cannot afford or are ineligible for credible coverage. In truth, the purported "coverage" is extremely limited and essentially worthless, often leaving consumers with substantial unpaid medical bills and medical debt. This scheme, which has reaped substantial profits for the Defendants, was played upon the named Plaintiff and thousands of other vulnerable consumers across the United States.

## II. PARTIES, JURISDICTION, AND VENUE

2.

Plaintiff Jacquelyn Weaver ("Plaintiff") is an adult citizen of Alabama residing in St. Clair County, Alabama.

3.

Defendant The National Better Living Association (hereafter "NBLA" or "The Association") is a Georgia non-profit corporation which markets itself as a "membership association that seeks to improve the member's quality of life through wellness services, including group benefits." NBLA regularly and systematically transacts business in the State of Alabama.

4.

Defendant Allied Health Benefits, Inc. (hereafter "AHB") is a Georgia for-profit corporation. As described more fully herein, Defendant AHB entered into an agreement with the other Defendants to solicit, market, and sell the junk insurance challenged herein. As described more fully herein, AHB assisted in NBLA operations, "member" development, and other services to support the NBLA, including contracting with third-party telemarketers on behalf of NBLA for the sales and marketing of its memberships and insurance products. Upon information and belief, Defendants NBLA and AHB share overlapping officers, owners, and directors, and both operate out of the same

2

location. AHB regularly and systematically transacts business in Alabama.

5.

The United States Life Insurance Company in the City of New York (hereafter "USLIC") is a for-profit corporation incorporated in New York and doing business in the State of Alabama. USLIC is an AIG subsidiary that wrote and delivered a group master limited medical benefit insurance policy to NBLA as the policyholder, Policy No. G610-242.

6.

Defendant Albert Cormier Solutions, LLC (hereafter "ACS") is a Tennessee limited liability company and operated as one of the telemarketing agents for the Defendants for purposes of marketing, soliciting, and selling the NBLA memberships and junk insurance described herein. Upon information and belief, ACS regularly and continuously transacts business in the State of Alabama through its targeted marketing and soliciting efforts.

7.

Health Lead Systems, Inc. (hereafter "HLS") is a Texas corporation and operated as one of the telemarketing agents for the Defendants for purposes of marketing, soliciting, and selling the NBLA memberships and junk insurance described herein. Upon information and belief, HLS regularly and continuously transacts business in the State of Alabama through its targeted marketing and soliciting efforts.

8.

As described more fully herein, Defendants acted in conspiracy and conjunction with one another to perpetrate the scheme described herein, with each acting as the agent or principal of the other, or otherwise bound to the others, creating legal relationships whereby legal liability can be

3

imputed from one party to another.

9.

Venue is proper in this district and division in that the Plaintiff resides in this division, the Defendants regularly and continuously transact business in this division, and a substantial part of the acts and/or omissions giving rise to this action occurred in this division.

10.

Jurisdiction is proper in this Court under 28 U.S.C. §1331 in that Plaintiff asserts federal causes of action. Furthermore, Plaintiff's action comes within the purview of the Class Action Fairness Act of 2005.

### III. FACTUAL BACKGROUND

11.

The significant problems consumers have experienced in recent years with "association plan" health insurance are well documented. *See, e.g.,* "Association Health Insurance: Is It Time to Regulate This Product?" Kofman, M. and Lucia K., M. NAIC's *Journal of Insurance Regulation*, Fall 2005 Vol. 24, No. 1. Such associations must be organized for a specific purpose *other* than to sell health insurance. When coverage is sold through national associations, almost no consumer protections apply.

12.

Defendant The National Better Living Association was formed under dubious circumstances with loose membership criteria for the sole (and improper) purpose of soliciting and selling health insurance nationally to the insurance buying public. The health insurance sold by NBLA and its agents is purposefully bundled with other purported "benefits," such as travel discounts or pre-paid

4

legal services, to obfuscate the Association's *actual* purpose of soliciting and selling health insurance under the auspices of a "group association" or "group benefit," thus fostering a belief in consumers that the association coverage is "group" coverage with benefits and protections similar to job-based group insurance.

13.

The Association entered into master group contracts with The United States Life Insurance Company in the City of New York, an AIG subsidiary, for "health" policies that provide poor coverage and limited benefits. Further, Defendants NBLA and USLIC entered into an agreement which authorized Allied Health Benefits, Inc. to solicit, market, and sell the aforementioned limited coverage underwritten by USLIC to consumers in Alabama and other states. As previously alleged, AHB is a for-profit company that shares officers, directors, and the same office location as NBLA.

14.

The Association's "membership" consists of insurance consumers who were seeking, and who believed they were buying, comprehensive health or major medical insurance. The intended targets of Defendants' scheme and conspiracy are consumers who do not qualify for (perhaps due to pre-existing conditions) or otherwise cannot afford comprehensive health or major medical insurance. Defendants' targeted consumers were not previous members of the Association, but instead automatically became members of the Association when they purchased the junk insurance at issue herein, which was deceptively marketed and sold by Defendants as major medical coverage.

15.

As stated, Defendants conspired and agreed to allow AHB and its agents to market, solicit, and sell the aforementioned limited coverage underwritten by USLIC, including the use of various

5

call centers and telemarketers to solicit and close "sales" of the limited junk insurance at issue. These call centers and telemarketers include Albert Cormier Solutions, LLC, Health Lead Systems, Inc., and their employees. Defendants' telemarketers obtain targeted consumer information via questionable "get-a-quote" internet websites, and then utilize aggressive and deceptive internet and direct telephone marketing to "sell" what the consumer is led to believe is comprehensive health and major medical coverage. Defendants and their agents, including their telemarketers, will aggressively say whatever it takes to make the sale, including representations that are false, misleading, or incomplete.

16.

With NBLA's and USLIC's full knowledge and consent, AHB, including its agents and hired telemarketers, engaged in uniform, intentionally misleading marketing which, among other things, misrepresented the USLIC policies as comprehensive health plans providing major medical coverage, when in truth the policies were extremely limited and worthless. In marketing and selling the insurance product, Defendants and their authorized agents would make representations regarding coverage terms that were false, misleading, or incomplete to induce consumers to purchase the coverage. Defendants all knew or should have known of the false and incomplete information being provided to consumers to induce purchase.

17.

Defendants and their agents intentionally played upon the vulnerabilities of people who either could not qualify for, or could not afford, traditional major medical health insurance coverage by falsely presenting the USLIC policies as a low cost way to obtain such coverage.

18.

6

Defendants engaged in intentionally misleading marketing by, among other things, misrepresenting the limited health insurance policies as comprehensive plans providing major medical coverage.

19.

Defendants' deception is further fostered from the Association's affiliation with the health insurance product and Defendants' intentional misleading marketing tactics emphasizing "group coverage" and "group benefits." Health insurance offered by national associations is perceived by the public to be bona fide, comprehensive health insurance with benefits and protections similar to employer-based group insurance. Defendants' systematic and misleading marketing tactics, in the form of representations made on websites, in written materials provided to "members," and in telemarketing phone calls, further foster this belief. Indeed, Defendants intended to create a false impression surrounding the USLIC plan by referring to it as "group" insurance or "group benefits."

20.

As part of their deceptive scheme and conspiracy, Defendants and their agents engage in a systematic practice of false and misleading advertising and marketing. This includes, among other things, systematic representations and omissions from call representatives about the policy providing major medical benefits and coverage; promises and representations that the insurance would provide full coverage for all pre-existing conditions; and systematic, uniform misrepresentations and omissions on websites and in written materials promising to, among other things, "pay benefits like a major medical insurance plan." Through their systematic and deceptive tactics online, in calls, and in print, Defendants induced vulnerable consumers needing individual health coverage to purchase the policy underwritten by USLIC and pay premiums therefor. Upon information and belief, each

7

Defendant was aware of, and approved, the misleading marketing and advertising tactics described herein.

21.

Once a consumer is induced to purchase the insurance by reason of Defendants' deceptive scheme, the consumer's personal banking information is taken online or by phone so that the undisclosed "membership fees" and insurance premiums can be directly obtained from the consumer via debit or credit card, effective immediately.

22.

Despite marketing and selling the USLIC policy to vulnerable consumers as comprehensive health or major medical coverage, the policy is, in truth, very limited and of little or no value to the consumer in need of individual health insurance. Defendants continue their intended deception in correspondence and "insurance cards" provided to consumers.

23.

These improper practices employed by Defendants result in consumers, like Plaintiff, paying out of pocket premiums for useless coverage, usually at a time when they need legitimate, meaningful health insurance the most. Further, often times these improper practices leave consumers with substantial medical debt.

24.

The NAIC is the United States standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states. In an article published by the NAIC's official *Journal of Insurance Regulation*, the author notes the impropriety surrounding the exact-type scheme played by Defendants here:

8

*"Stacked Policies" (Limited Coverage Marketed as Comprehensive Coverage)*

Regulators have also observed cases in which consumers were led to believe that they had purchased comprehensive health insurance when, in fact, they were sold a "limited benefit plan" with "riders" (add-ons to the coverage). Although such "stacked" policies may look like they have extensive benefits, they actually have major gaps and do not provide the same level of coverage as comprehensive policies. In addition to coverage gaps, limited benefit plans, e.g., indemnity policies, are exempt from federal Health Insurance Portability and Accountability Act (HIPAA) requirements and from most state-based consumer protections applicable to major medical health insurance. Regulators have expressed strong concerns over the sale of such products, especially given misleading marketing practices that induce some consumers to drop comprehensive insurance for limited benefit policies. Not until consumers begin making claims and incur substantial financial burdens do they realize how little protection "stacked" policies actually provide.

These practices result in consumers being responsible for a large portion of their medical bills. In some states, regulators' attempts to address consumer problems have been hampered by their lack of authority over association coverage.

Association Health Insurance: Is It Time to Regulate this Product? Kofman, M. and Lucia K., M. NAIC's *Journal of Insurance Regulation*, Fall 2005 Vol. 24, No. 1.

25.

At all times relevant hereto, Defendants acted in concert and in conspiracy with one another in formulating and designing this deceptive "association scheme," including the deceptive marketing, solicitation, and sales practices described herein. Each Defendant was the principal, agent, servant, employee, or otherwise bound to the others, creating legal relationships whereby legal liability can be imputed from one party to another.

9

26.

The bogus "health" insurance product described herein was not approved for sale in the state of Alabama, nor were any of the Defendants or their agents approved to sell the product herein. Moreover, the product was marketed, solicited, and sold in Alabama, as well as other states, by unlicensed producers with Defendants' full knowledge and acquiescence. All Defendants, including USLIC, knew that unlicensed producers were being utilized in soliciting, marketing, and selling the USLIC product described herein.

## IV. DEFENDANTS' DEALINGS WITH PLAINTIFF

27.

In February 2009, Plaintiff began looking for affordable, individual comprehensive health insurance coverage. Around this time, Plaintiff viewed a webpage maintained by one or more of the Defendants herein (or their authorized agent) purporting to sell real, individual health policies. The webpage falsely purported to offer real group-based health insurance providing comprehensive medical coverage and extensive medical benefits, much like bona-fide group-based health insurance offered by employers. The webpage used words and phrases indicating that the available individual health insurance was comprehensive in scope and provided extensive benefits for major medical coverage. In reliance on the representations contained on this webpage, Plaintiff completed online information needed in order to receive a quote.

28.

After Plaintiff provided the requested information online, she immediately received a call from one of the Defendants' authorized telemarketer agents. Based upon her conversations with Defendants' telemarketer agent, Plaintiff believed she was communicating and dealing with a health

10

insurance company. In this conversation, the telemarketer agent further perpetrated the indication from the webpage that the coverage being offered was real health insurance with extensive medical benefits. Plaintiff specifically requested and expressed her desire for comprehensive, major medical individual health insurance. Defendants' telemarketer agent made representations to Plaintiff that comprehensive, major medical coverage is what would be provided. In aggressive, "tell them anything" pitches to Plaintiff, Defendants' agent promised comprehensive health coverage regardless of any pre-existing conditions, and with no limits on doctor visits within Defendants' PPO network. Defendants' agent did nothing to negate Plaintiff of the notion that she was purchasing real, comprehensive health insurance. Defendants' agent intentionally suppressed and omitted material facts from Plaintiff to induce the sale, including the fact that the coverage being sold was not, in fact, comprehensive medical coverage, but instead was very limited in nature. Despite inquiry by Plaintiff, Defendants' agent failed to disclose the fact that the subject insurance was extremely limited and would not cover the cost incurred to treat any kind of injury or illness. Defendants' agent failed to disclose the fact that the coverage was nothing like the kind of health insurance offered by employers. These facts involving the core terms of coverage were obviously material and important to Plaintiff, causing her to rely to her detriment.

29.

These misleading representations and omissions from Defendants' website and its authorized telemarketing agent induced Plaintiff to purchase the limited insurance underwritten by USLIC. Plaintiff relied to her detriment in this regard and believed she had real, comprehensive health insurance.

11

30.

Defendants' representations, misrepresentations, and omissions induced Plaintiff to purchase the policy and to rely upon assurances that she had comprehensive health insurance or "major medical insurance" coverage. Defendants engaged in conduct intended to produce the erroneous impression that Plaintiff purchased health insurance that immediately covered medical care and hospitalization. Defendants failed to truthfully advise Plaintiff as to the very limited nature of her health insurance coverage and failed to make a full and fair disclosure of this limited health insurance coverage upon inquiry by Plaintiff.

31.

Once Plaintiff agreed to purchase the offered coverage per Defendants' aggressive marketing tactics, Defendants' agent obtained Plaintiff's billing/banking information for immediate debiting of her account. Defendants debited amounts for the undisclosed membership/association fee, as well as premiums for the subject coverage.

32.

Plaintiff never received a copy of her health insurance policy, but she did receive what purported to be an "insurance card" by mail and form correspondence from Defendants, all of which further fostered Plaintiff's belief that she had health coverage.

33.

As a result of Defendants' deceptive scheme, Plaintiff incurred expenses in the form of premium payments for illusory coverage and illegal "membership" dues, along with other economic and non-economic damages.

12

## V. CLASS ACTION ALLEGATIONS

34.

Plaintiff brings this action pursuant to Federal Rules of Civil procedure 23(a) and 23(b)(1),

(b)(2) and (b)(3) on behalf of herself and a nationwide Class consisting of:

> All consumers in the United States who paid "membership fees" to
> the National Better Living Association, Inc. and who paid premiums
> for the coverage underwritten by USLIC referenced herein.

35.

The Class excludes Defendants and any entity in which any defendant has a controlling

interest, and their officers, directors, legal representatives, successors and assigns.

36.

The Class is so numerous that joinder of all members is impracticable.

37.

A Class action is superior to all other available methods for the fair and efficient adjudication

of this controversy.

38.

Plaintiff's claims are typical of the claims of the Class.

39.

There are questions of law and fact common to the Class, including but not limited to:

a.      Whether Defendants engaged in an improper scheme to solicit, market and

sell worthless, junk insurance;

b.      Whether Defendants profited from the improper conduct challenged herein;

13

c.     Whether Defendants' "association" insurance scheme constituted mail or wire fraud;

d.     Whether Defendants breached the terms of agreements with Plaintiff and putative class members;

e.     Whether Defendants have been unjustly enriched;

f.     Whether Defendants are liable to Plaintiff and the class for damages and, if so, the measure of such damages.

40.

These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.

41.

Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has no claims antagonistic to those of the Class. Plaintiff has retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation. Plaintiff's counsel will fairly, adequately and vigorously protect the interests of the Class.

42.

Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

14

43.

Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

44.

Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

45.

Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common tot he members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I
## Violations of the Racketeer Influenced and Corrupt Organizations Act,
## 18 U.S.C. §§ 1961-1968
## (Against All Defendants)

46.

Plaintiff adopts and incorporates all previous allegations in full.

15

47.

Plaintiff, each class member, and each Defendant are "persons," as that term is defined in 18 U.S.C. §§1961(3) and 1962(c).

48.

The RICO "Enterprise" is an association-in-fact, as that term is defined in 18 U.S.C. §§1961(4) and 1962(c), consisting of all of the Defendants named herein, including their employees, agents, and direct and/or indirect subsidiaries (the "Enterprise"). The Enterprise was separate and distinct from the persons that constituted the Enterprise.

49.

The companies and individuals that constitute the Enterprise were associated for the common purpose of fraudulently procuring insurance premiums and "membership fees" for worthless, junk insurance that was sold, marketed, and solicited as comprehensive major medical coverage. The purpose thereof was to induce consumers to pay fraudulent and improper premiums with respect to such insurance. At all relevant times, the Enterprise was engaged in, and its activities effected, interstate commerce. The proceeds of the Enterprise were distributed to its participants, including those Defendants named herein.

50.

Upon information and belief, the Enterprise has operated from at least January 2008 and, upon information and belief, is still ongoing.

51.

At all relevant times, in violation of 18 U.S.C. §1962(c), Defendants conducted the affairs of the Enterprise through a patternn of racketeering activity as defined in RICO, 18 U.S.C. §1961(5)

16

by virtue of the systematic conduct and actions described throughout this Complaint. The pattern of racketeering activity consisted of mail and wire fraud in violation of 18 U.C.S. §§1341 and 1343. Defendants engaged in an intentional scheme or artifice to defraud consumers and to obtain money and/or property from consumers through false or fraudulent pretenses, representations and promises.

52.

Each premium payment or membership fee extracted by Defendants constituted a predicate act of mail and wire fraud in that each furthered and executed the scheme to improperly sell worthless, junk insurance under the auspices of comprehensive major medical coverage.

53.

It was reasonably foreseeable to each Defendant that the mails and wires would be used in furtherance of the scheme, and the mails and wires were, in fact, used to further and execute the scheme. The nature and pervasiveness of the Enterprise necessarily entailed frequent wire and mail transmissions.

54.

For the purpose of furthering and executing the scheme, Defendants regularly transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, electronic data and funds, and also regularly caused matters and things to be placed in post offices or authorized depositories, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier. For example, as alleged herein, Defendants utilized deceptive webpages to steer consumers to their scheme, utilized the mail in sending deceptive written materials, correspondence, purported "insurance cards," and other documents furthering the overall scheme described herein; and utilized mail and electronic wires to obtain the

17

improper premiums and membership fees described herein. Further, Defendants' conduct of contacting Plaintiff over the telephone and making fraudulent pretenses, representations and promises about the scope of insurance coverage being offered in order to induce consumers into becoming NBLA members, as described throughout this Complaint, is conduct constituting racketeering activity.

55.

Each electronic and postal transmission was incident to or an essential part of the scheme. Defendants engaged in similar activities with respect to each member of the class and other NBLA "members." This systematic pattern of engaging in these racketeering activities is evidenced through the hundreds of consumer complaints regarding Defendants' practices found online, through numerous complaints submitted by consumers to the Better Business Bureau, through other lawsuits against Defendants filed by defrauded consumers, and by regulatory and administrative actions taken in certain states wherein Defendants' scheme was shut down.

56.

These electronic and postal transmissions constitute predicate acts of wire and mail fraud in that each transmission further and executed the scheme to defraud consumers.

57.

Each Defendant participated in the scheme to defraud knowingly, wilfully, and with a specific intent to defraud consumers into paying premiums and fees for worthless, junk insurance marketed and sold as comprehensive medical coverage.

18

58.

These predicate acts of mail and wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. §1961(5). As described above, these predicate acts were not isolated events, but related acts aimed at the common purpose and goal of defrauding consumers into paying premiums and fees for worthless, junk insurance marketed and sold as comprehensive medical coverage. These practices enabled Defendants to reap substantial and illicit profits.

59.

Defendants were common participants in the predicate acts. Their activities amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive consumers.

60.

As a direct and proximate result of Defendants' violations of 18 U.S.C. §1962(c), Plaintiff and the class have been injured in their business or property within the meaning of 18 U.S.C. §1964(c). Plaintiff and class members paid premiums and membership fees as a result of the scheme. Pursuant to 18 U.S.C. §1964(c), Defendants are jointly and severally liable to Plaintiff and the class for three (3) times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## COUNT II
## Conspiracy to Violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(d) (Against All Defendants)

61.

Plaintiff adopts and incorporates all previous allegations in full.

19

62.

RICO, 18 U.S.C. §1962(d), provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

63.

Defendants have violated 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §1962(c).

64.

As set forth in Count I, above, at all relevant times, Plaintiff and the class were "persons" within the meaning of RICO, 18 U.S.C. §§1961(3) and 1962(d).

65.

Defendants formed the previously alleged association-in-fact Enterprise, within the meaning of 18 U.S.C. §1961(4), for the common purpose of fraudulently obtaining premiums for junk insurance marketed and sold as comprehensive major medical coverage. The purpose thereof was to induce consumers to pay and incur improper premium charges in respect of such insurance.

66.

The Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. §1962(c).

67.

As set forth in Count I above, Defendants associated with the Enterprise, conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §1961(5) in violation of 18 U.S.C. §1962(c).

20

68.

Defendants each were associated with the Enterprise and agreed and conspired to violate 18 U.S.C. §1962(c), and agreed to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(d).

69.

Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth in Count I, above.

70.

As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §1962(c), Plaintiff and the Class have been and are continuing to be injured in their business and property in an amount to be determined at trial. Such injuries include, but are not limited to, paying premium and fees with respect to the junk insurance as a direct, proximate and foreseeable result of the scheme alleged herein.

71.

Under the provisions of 18 U.S.C. §1964(c), Defendants are jointly and severally liable to Plaintiff and the class for three (3) times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

21

## COUNT II
## Breach of Contract
## (Against Defendant NBLA)

72.

Plaintiff adopts and incorporates all previous allegations in full.

73.

Defendants had a contractual obligation to provide comprehensive health insurance coverage

to consumers who signed up as NBLA members.

74.

Defendants breached this contractual obligation by failing to provide comprehensive health

insurance, instead only providing a limited medical benefit.

75.

As a result of Defendants' breach of contractual obligations, Plaintiff and class members

incurred damages in the form of premiums and membership fees paid for worthless, junk insurance,

as well as other economic and non-economic damages.

## COUNT III
## Common Law Restitution/Unjust Enrichment/Disgorgement
## (Against All Defendants)

76.

This claim is pled in the alternative to Plaintiff's Breach of Contract claim. Plaintiff adopts

and incorporates all previous allegations, except for those contained in Plaintiff's Breach of Contract

claim above.

22

77.

Plaintiff and the class members have conferred a substantial benefit upon Defendants derived from the insurance premiums and fees discussed herein. These benefits came at the expense of Plaintiff and the class members.

78.

The circumstances are such that, in equity and good conscious, restitution should be made by Defendants to Plaintiff and class members.

79.

As a result of Defendants' unjust enrichment, Plaintiff and the class have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged herein.

80.

Plaintiff and the class are entitled to restitution and/or disgorgement of profits realized by Defendants as a result of their unfair, unlawful, and deceptive practices.

**PRAYERS FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court enter a judgment against Defendants and in favor of Plaintiff and the class and award the following relief:

  a.   For an order declaring that this action may be maintained as a class action pursuant to Rule 23 of the Federal rules of Civil Procedure, and for an order certifying this case as a class action and appointing Plaintiff as representative of the Class;

  b.   For an order awarding compensatory damages on behalf of Plaintiff and the class in an amount to be proven at trial;

23

c.  For judgment for Plaintiff and the class on their claims in an amount to be proven at trial, for compensatory damages caused by Defendants' deceptive practices; along with exemplary damages to each class member for each violation;

d.  For judgment for Plaintiff and the class on their RICO claims, in an amount to be proven at trial, for three (3) times the amount of charges paid to Defendants by Plaintiff and the class;

e.  For restitution of all improperly collected charges and interest, and the imposition of an equitable constructive trust over all such amounts for the benefit of Plaintiff and the class;

f.  For pre-judgment and post-judgment interest as provided for by law or allowed in equity;

g.  For an order awarding Plaintiff and the class their attorneys' fees and costs; and

h.  Such other and further relief as may appear necessary and appropriate.

## JURY TRIAL DEMANDED

Pursuant to Federal Rules of Civil Procedure 38, Plaintiff demands a trial by jury of the

claims alleged herein.

R. Brent Irby

OF COUNSEL:
Charles A. McCallum, III
McCALLUM, HOAGLUND, COOK & IRBY, L.L.P.
905 Montgomery Highway
Suite 201
Vestavia Hills, Alabama 35216
Telephone: (205)824-7767
Facsimile: (205)824-7768
Email: birby@mhcilaw.com
        cmccallum@mhcilaw.com

24

**Please serve Defendants via Certified Mail/Return Receipt Requested as follows:**

The National Better Living Association, Inc.
c/o David S. Cooper, Registered Agent
3414 Peachtree Road
Suite 1600
Atlanta, Georgia 30326

Allied Health Benefits, Inc.
c/o David Saunders Cooper, Registered Agent
3414 Peachtree Road
Suite 1600
Atlanta, Georgia 30326

The United States Life Insurance Company in the City of New York
c/o Barb Moore, Registered Agent
2727 Allen Parkway
Houston, Texas 77019

Albert Cormier Solutions, LLC
c/o Crystal Correll
7633 Luscombe Drive
Knoxville, Tennessee 37919

Health Lead Systems, Inc.
c/o Jess Jordon, Owner
7996 E. Mansfield Highway
Kennedale, Texas 76060