FILED

2014 Feb-24  PM 05:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| JACQUELYN WEAVER, | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| v. | * | CIVIL ACTION NO. |
| | * | 4:13-CV-2112-VEH |
| THE NATIONAL BETTER LIVING | * | |
| ASSOCIATION, INC.; THE UNITED | * | |
| STATES LIFE INSURANCE | * | |
| COMPANY IN THE CITY OF NEW | * | |
| YORK; NATIONAL HEALTHCARE | * | |
| ADVISORS; HEALTH LEAD | * | |
| SYSTEMS, INC.; ALBERT CORMIER | * | |
| SOLUTIONS, LLC; INTERNATIONAL | * | |
| MARKETING, ADMINISTRATION | * | |
| AND INSURANCE BROKERAGE | * | |
| CORPORATION OF | * | |
| MASSACHUSETTS, | * | |
| | * | |
| **Defendants.** | * | |

### FIRST AMENDED CLASS ACTION COMPLAINT

COMES NOW, Plaintiff Jacquelyn Weaver, on behalf of herself and a class of similarly situated persons as defined herein, and hereby files the following First Amended Class Action Complaint against Defendants The National Better Living Association, Inc.; The United States Life Insurance Company in the City of New York; National Healthcare Advisors; Health Lead Systems, Inc.; Albert Cormier Solutions, LLC; International Marketing, Administration and Insurance Brokerage

Corporation of Massachusetts, and, upon investigation, due diligence, and information and belief, alleges as follows:

## I. NATURE OF THIS ACTION

### 1.

This action challenges a nationwide insurance scheme and conspiracy carried out by the Defendants to enrich themselves at the expense of vulnerable consumers seeking individual health insurance. As described more fully herein, the Defendants, in conjunction and conspiracy with each other, knowingly and intentionally carried out a scheme to deceptively market and sell certain worthless junk insurance through the illegal use of unlicensed and predatory "tell them anything" telemarketing agents. These telemarketing agents were known by the Defendants to be unlicensed and utilizing misleading tactics to sell the junk insurance at issue in this action.

### 2.

As described more fully herein, the scheme is carried out through the use of a dubious "group association," which is nothing more than a subterfuge to evade regulatory oversight. Then, as part of the association's purported "group benefit," certain worthless, junk insurance underwritten by United States Life Insurance Company in the City of New York ("USLIC") was knowingly, purposefully, illegally, and deceptively sold as comprehensive major medical insurance to consumers who

could not afford or are ineligible for credible coverage. With the association's and the underwriter's full knowledge and consent, aggressive telemarketers who were in no way licensed to sell insurance coverage were intentionally utilized to deceptively market and sell the bogus insurance as agents for the association and the underwriter. Through the use of deception in phone calls, internet advertising, print media, television advertising, and written materials, the subject insurance was marketed and sold as comprehensive, major medical insurance. In truth, the coverage is extremely limited and essentially worthless, thus often leaving consumers with substantial unpaid medical bills and medical debt.

3.

This scheme and conspiracy, which reaped substantial profits for the Defendants which they distributed among themselves, was played upon the named Plaintiff and, over at least the past seven (7) years, over thousands of other vulnerable consumers across the United States. Indeed, the illegal scheme described herein was so rampant and widespread that in 2011 it sparked a comprehensive investigation and regulatory action against these Defendants by the Montana Insurance Commissioner, resulting in significant fines and the cessation of the scheme in Montana. (*See* Exhibit A to this Complaint.) As stated by Montana's Insurance Commissioner, Monica J. Lindeen: "Association scams are one of the worst insurance scams

operating today.  By leading people to believe they had the full coverage of major medical health insurance, these scams damaged not only their victims' wallets, but their health.  This case should send a clear message to scammers who would follow in their footsteps: not in Montana." (Exhibit A to this Complaint.)  Similarly, this scam sparked a comprehensive investigation and regulatory action by the Georgia Insurance Commissioner, which also resulted in significant fines and the cessation of the scheme in Georgia.  (Exhibit B to this Complaint.)  Additionally, the scheme and conspiracy challenged in this action were the subject of a disturbing and revealing investigative segment broadcast nationally on Dateline NBC on March 26, 2012.  In the Dateline NBC investigative segment, the operation of this scheme was analyzed in detail, with undercover film showing the illegal operation in motion.  The Dateline  NBC  investigative  segment  can  be  viewed  at www.nbcnews.com/video/dateline/46860128/#46860128.

4.

In this action, Plaintiff seeks redress on behalf of herself and others similarly situated who were victims of this bogus insurance scam intentionally carried out by the Defendants in conspiracy with one another.  As described herein, the Defendants' widespread use of interstate wires and United States mail were integral in carrying out the scheme, and thus Plaintiff asserts claims for violations of the federal Racketeering

Influence and Corrupt Organizations Act ("RICO"), as well as common law claims for breach of contract, unjust enrichment, and fraud/suppression.

## II. PARTIES, JURISDICTION, AND VENUE

5.

Plaintiff Jacquelyn Weaver ("Plaintiff") is an adult citizen of Alabama residing in St. Clair County, Alabama.

6.

Defendant The National Better Living Association (hereafter "NBLA") is a Georgia non-profit corporation which markets itself as a "membership association that seeks to improve the member's quality of life through wellness services, including group benefits." NBLA regularly and systematically transacts business in the State of Alabama. Upon information and belief, NBLA has never had proper appointments from any of the insurance companies whose products NBLA markets and sells.

7.

The United States Life Insurance Company in the City of New York (hereafter "USLIC") is a for-profit insurance corporation incorporated in New York and doing business in the State of Alabama. USLIC is an AIG subsidiary that wrote and delivered a group master limited medical benefit insurance policy to NBLA as the

5

policyholder, Policy No G610-242, discussed more herein.

8.

Health Lead Systems, Inc. is a Texas corporation and operated as one of the telemarketing agents for NBLA and USLIC for purposes of marketing, soliciting, and selling the bogus insurance described herein. Upon information and belief, Health Lead Systems, Inc. regularly and continuously transacts business in the State of Alabama through its targeted marketing and soliciting efforts.

9.

National Healthcare Advisors is a Texas corporation and operated as one of the telemarketing agents for NBLA and USLIC for purposes of marketing, soliciting, and selling the bogus insurance described herein. Upon information and belief, National Healthcare Advisors regularly and continuously transacts business in the State of Alabama through its targeted marketing and soliciting efforts.

10.

Defendant Albert Cormier Solutions, LLC is a Tennessee limited liability company and operated as one of the telemarketing agents for NBLA and USLIC for purposes of marketing, soliciting, and selling the bogus insurance described herein. Upon information and belief, Albert Cormier Solutions, LLC regularly and continuously transacts business in the State of Alabama through its targeted

marketing and soliciting efforts.

11.

Defendant International Marketing, Administration and Insurance Brokerage Corporation of Massachusetts ("IMAC") is an insurance brokerage firm with its principal place of business located in Randolph, Massachusetts. As described more fully herein, IMAC was the insurance brokerage firm that brought NBLA and USLIC together in furtherance of carrying out the scheme described herein, and profited from the scheme and wrongful conduct by receiving a portion of the monthly fees collected from victimized consumers.

12.

As described more fully herein, these Defendants acted in conspiracy and conjunction with one another, as part of a RICO Enterprise, to perpetrate the insurance scheme and pattern of related racketeering activity described herein, with each acting as the agent or principal of the other, or otherwise bound to the others, creating legal relationships whereby legal liability can be imputed from one party to another.

13.

Venue is proper in this district and division in that the Plaintiff resides in this division, the Defendants regularly and continuously transact business in this division,

7

and a substantial part of the acts and/or omissions giving rise to this action occurred in this division.

14.

Jurisdiction is proper in this Court under 28 U.S.C. §1331 in that Plaintiff asserts federal causes of action.  Furthermore, Plaintiff's action comes within the purview of the Class Action Fairness Act of 2005.

### III.  FACTUAL BACKGROUND

### A.  General Overview of the Scheme.

15.

Before describing the role each Defendant played in the subject scheme, conspiracy, and Enterprise, a general overview of the scheme is instructive.  Again, this action challenges an "association plan" health insurance scam intended to take advantage of vulnerable consumers seeking comprehensive individual health coverage.  Defendant NBLA allowed loose membership criteria for the sole and improper purpose of soliciting and selling health insurance nationally to the insurance buying public.[1]  NBLA then entered into a master group contract with the United States Life Insurance Company in the City of New York ("USLIC"), an AIG

---

[1] Associations such as NBLA must be organized and operate for a specific purpose *other than* to sell health insurance.  When coverage is sold through national associations, almost no consumer protections apply.

8

subsidiary, to underwrite certain "health" policies that provide poor coverage and limited benefits. Per USLIC's agreement with NBLA, NBLA and its authorized agents/affiliates would market, solicit, and sell USLIC's coverage to consumers in Alabama and other states. Upon information and belief, USLIC had involvement, knowledge, and a degree of control over the means and method by which its coverage would be marketed and sold by NBLA and its agents.

16.

NBLA, both directly and through its authorized agents/affiliates, then utilized deceptive marketing tactics in television, print media, and online to market the limited USLIC coverage as providing comprehensive health or major medical insurance to individuals who may not otherwise qualify for (perhaps due to pre-existing conditions) or who cannot afford individual major medical coverage. For example, one NBLA television advertisement touted "AFFORDABLE QUALITY HEALTHCARE" with "ACCEPTANCE GUARANTEED REGARDLESS OF PAST MEDICAL HISTORY," with real benefits including "DOCTOR VISITS, HOSPITALIZATION, ICU, SURGICAL, PRESCRIPTION DRUGS.... ." Similar marketing was conducted online. These marketing tactics were designed and intended to lead consumers to believe that the insurance being offered was real, comprehensive health or major medical insurance. Upon information and belief,

USLIC had knowledge, involvement, a degree of control over, and agreed to the marketing tactics employed by NBLA and NBLA's authorized agents/affiliates in marketing USLIC's coverage.

17.

With USLIC's full knowledge and consent, NBLA and its authorized agents/affiliates employed and entered into agreements with certain telemarketing "call centers" who would solicit consumers directly via fake "get-a-quote" websites or take incoming consumer calls from NBLA advertising. Upon information and belief, these call centers consisted of National Health Advisors, Health Lead Systems, Inc., and Albert Cormier Solutions. As evidenced by the pattern of consistent consumer complaints found in the regulatory actions from Georgia and Montana, in other civil litigation, and in the undercover film captured by Dateline NBC, these telemarketers engaged in widespread "tell them anything" fraud and misrepresentation to sell the subject insurance. These telemarketers, with NBLA's and USLIC's knowledge and consent, systematically represented the USLIC policies as comprehensive health plans providing major medical coverage, when in truth the policies were extremely limited and worthless. These telemarketers were acting as agents of NBLA and USLIC in perpetrating this fraud, and were known by NBLA and USLIC to be utilizing deceptive representations. Further, these telemarketers

who were marketing USLIC's coverage through deceptive means were also selling the insurance, even though they were not licensed to sell insurance, and NBLA and USLIC knew they were not licensed or appointed.  As stated by the Montana Insurance Commissioner following her investigation and in her regulatory action: "...one insurance company involved with NBLA, USLIC, authorized or encouraged the practice of using unlicensed producers .... USLIC appears to have sanctioned the use of unlicensed solicitors in its agent marketing agreement with Timothy Siewert [of NBLA], and knew or should have known of solicitor misrepresentation, such as to indicate a general business practice." (*See* Exhibit A to this Complaint.)

18.

NBLA and USLIC, through their telemarketing agents known by NBLA and USLIC to be unlicensed and engaged in widespread fraud, played upon the vulnerabilities of people who either could not qualify for, or could not afford, traditional major medical health insurance coverage by falsely representing the USLIC coverage as a low cost way to obtain such coverage.  These Defendants intentionally perpetrated a scheme to misrepresent the limited health insurance policies as comprehensive plans providing major medical coverage.

19.

Once a consumer is induced to purchase the insurance by virtue of this deceptive conduct, the consumer's personal banking information is taken so that undisclosed "membership fees" and insurance premiums can be directly obtained from the consumer via debit or credit card, effective immediately, with monthly debits thereafter. The materials subsequently mailed to the consumer by NBLA and USLIC, including deceptive "insurance cards," only further foster the deception and do nothing to negate the representation and consumer understanding that what is being provided is real, comprehensive medical coverage. As stated by the former Insurance Commissioner of Maine in the Dateline NBC segment: "you really have to have a PhD in insurance to understand the fine print of these policies."

20.

This deceptive scheme employed by the Defendants results in consumers, like Plaintiff, paying out of pocket money, typically around $200 a month, for useless coverage, usually at a time when they need legitimate, meaningful health insurance the most. Further, often times these improper practices leave consumers with substantial medical debt. As described more herein, the monthly payments collected by NBLA were distributed among the Defendants in accord with their purposeful scheme, conspiracy, and unlawful Enterprise.

12

### B. **The Defendants involved in the scheme and conspiracy and who, along with other third-party persons and entities, form the RICO Enterprise**.

21.

(1)    The National Better Living Association (NBLA)

Defendant The National Better Living Association (hereafter "NBLA") is a Georgia non-profit corporation which markets itself as a "membership association that seeks to improve the member's quality of life through wellness services, including group benefits." NBLA regularly and systematically transacts business in the State of Alabama. Upon information and belief, NBLA has never had proper appointments from any of the insurance companies whose products NBLA markets.

22.

The scheme and conspiracy described herein was, upon information and belief, orchestrated by NBLA through its individual officers/principals. NBLA also utilized its affiliated entities as authorized agents in perpetrating the scheme, including for-profit affiliated entities established by NBLA's officers and principals, Allied Health Benefits, Inc. and CorpSavers Healthcare, Inc.

23.

NBLA entered into a master group contract with USLIC, an AIG subsidiary, for "health" policies that provide poor coverage and limited benefits. NBLA further

entered into an agreement with USLIC which allowed NBLA, both directly and through NBLA's authorized agents/affiliates, to solicit, market, and sell USLIC's limited coverage.  NBLA and USLIC agreed and conspired to market and sell the coverage through illegal and fraudulent means as described in this action.

24.

NBLA, both directly and through its authorized agents/affiliates, deceptively marketed the coverage underwritten by USLIC as real, comprehensive medical coverage.  NBLA directly engaged in this deceptive advertising through its website, as well as through television and print media.  Additionally, sales of the USLIC coverage through NBLA's website were made by NBLA, even though NBLA was not licensed to sell insurance, nor had USLIC appointed NBLA as one of its insurance producers.

25.

NBLA, directly and/or through its authorized agents/affiliates, entered into agreements with telemarketing "call centers" to market and sell USLIC's coverage through direct solicitation and through telephone sales.  NBLA and USLIC entered into an improper agreement and conspiracy with these Telemarketing Defendants to aggressively market and sell USLIC's coverage through the deceptive and illegal means described herein, including misrepresentations about the coverage providing

14

comprehensive medical insurance, and the rampant and widespread use of unlicensed individuals to sell the insurance. These Telemarketing Defendants and their employees were acting as agents of NBLA and USLIC when marketing and selling the subject coverage in the manner described in this action. Upon information and belief, NBLA and USLIC knew of, agreed to, and intended for the subject coverage to be marketed and sold in the deceptive and illegal manner described in this action.

26.

As described more fully herein, NBLA further perpetrated the deceptive scheme by mailing to consumers purchasing the USLIC coverage materials pertaining to the purported health insurance coverage, including "insurance cards," which further fostered the fraud and did nothing to negate the understanding created by the deception that the coverage was comprehensive medical insurance. Further, NBLA collected the monthly fees paid by consumers victimized by this scheme, retained a portion of those monthly fees, and distributed the remainder among the other Defendants in accordance with their agreed upon scheme, conspiracy, and Enterprise.

27.

(2)    The United States Life Insurance Company in the City of New York (USLIC)

The United States Life Insurance Company in the City of New York ("USLIC")

15

is a for-profit insurance carrier incorporated in New York and doing business in Alabama. USLIC is an AIG subsidiary that wrote and issued a group master limited medical benefit insurance policy to NBLA as the policyholder, Policy No. G610-242. The effective date of this policy was December 1, 2006 and, upon information and belief, expired on November 30, 2009. The group master policy entered into between USLIC and NBLA provides limited benefits and poor coverage - - - it does not provide comprehensive health coverage.

28.

As alleged herein, USLIC entered into an agreement with NBLA (and/or NBLA's authorized agent/affiliate) which authorized NBLA and its agents to market, solicit, and sell the coverage underwritten by USLIC. Upon information and belief, USLIC had knowledge, involvement, and a degree of control over the means and methods employed by NBLA and its agents in promoting and selling USLIC's coverage. As alleged herein, NBLA utilized deceptive means in television, print, and internet advertising to market USLIC's coverage, which USLIC knew of, approved, and agreed to. USLIC further knew of, authorized, acquiesced in, agreed to, and even encouraged the use of unlicensed telemarketers to sell USLIC's coverage through widespread, deceptive representations designed to lead consumers into believing that the USLIC coverage being offered was real, comprehensive individual health

insurance. USLIC knowingly and intentionally allowed unlicensed producers to market and sell its coverage, and is liable for the widespread misrepresentations made by NBLA and its agents, including the Telemarketing Defendants named herein and their employees. Upon information and belief, USLIC received a substantial portion of the monthly fees paid to NBLA by consumers who were victimized by this scheme.

29.

(3)   International Marketing, Administration and Insurance Brokerage Corporation of Massachusetts ("IMAC")

International Marketing, Administration and Insurance Brokerage Corporation of Massachusetts ("IMAC") is an insurance brokerage firm located in Randolph, Massachusetts. IMAC, through its principal, Edward Klayman, was the entity that brought NBLA and USLIC together so as to effectuate the improper insurance scheme described herein. IMAC agreed to the objective of the insurance scheme to be carried out and facilitated the perpetration of the scheme. Upon information and belief, IMAC participated in the illegal scheme by bringing USLIC to NBLA so that the known scheme and conspiracy could be carried out. Upon information and belief, IMAC also received a portion of the monthly fees paid by consumers who were victimized by the improper insurance scheme.

30.

(4)   <u>National Health Advisors, Health Lead Systems, Inc. and Albert Cormier Solutions, LLC</u>

National Health Advisors, Health Lead Systems, Inc. and Albert Cormier Solutions, LLC are the entities that were the telemarketing "call centers" or solicitors on behalf of NBLA and USLIC. These Defendants will be referred to collectively as the "Telemarketing Defendants." These Telemarketing Defendants, including their employees and agents, were engaged in the solicitation and sell of insurance for USLIC and NBLA while unappointed and unlicensed to sell insurance. Upon information and belief, these Telemarketing Defendants were the call centers utilized by NBLA and USLIC during the time period in question in this action. NBLA (and/or its authorized agent/affiliate) entered into agreements with each of these Telemarketing Defendants which allowed them to market, offer, and sell the subject USLIC coverage. These Telemarketing Defendants, through their hired employees and agents, engaged in a widespread pattern and practice of intentionally making deceptive misrepresentations about the subject coverage in order to secure sales on behalf of NBLA and USLIC. Upon information and belief, these Telemarketing Defendants received substantial commissions from each sale made on behalf of NBLA and USLIC. As described more fully herein, these Telemarketing Defendants

obtained targeted consumer information via questionable "get-a-quote" internet websites, and then utilized aggressive and deceptive telephone marketing to sell what the consumer is led to believe is comprehensive health and major medical coverage. These Telemarketing Defendants, through their agents and employees, would aggressively say whatever it takes to make the sell, including representations that were false, misleading, and/or incomplete.   These Telemarketing Defendants, including their employees and agents, were acting on behalf of, and as agents for, USLIC and NBLA, who were aware of and authorized the use of unlicensed producers and deceptive tactics to perpetrate sales.

## C. Other persons or entities involved in the scheme and conspiracy and who, along with the named Defendants, form the RICO Enterprise.

31.

In addition to the Defendants named in this action, there are other persons and entities who were involved in the scheme and conspiracy who were a part of the subject RICO Enterprise. These other persons and entities include, but are not limited to, the following:

(1)    Officers, directors, and principals of NBLA including, but not limited to, Timothy Patrick Siewert, George E. Spalding, Jr., Michael Siewert, John Fabbrini, Barry Shaw, Angus Morrison, and William Fink.  Indeed, a company or entity can

only act through its principal individuals, and these officers, directors, and principals of NBLA were involved in designing, orchestrating, and implementing the improper insurance scheme challenged in this action. These individual officers and principals entered into agreements, and took actions, on behalf of NBLA. Discovery will reveal precisely which officers and principals took what specific actions and made specific decisions. Upon information and belief, NBLA individual officer Timothy Siewert was instrumental in NBLA's agreement with USLIC to market and sell USLIC's coverage.

(2)     Companies and entities closely affiliated with NBLA and who share common officers and locations with NBLA including, but not limited to, Allied Health Benefits, Inc. and CorpSavers Healthcare, Inc.[2] Upon information and belief, at times these affiliated entities acted as authorized agents on behalf of NBLA.

(3)     Other insurance carriers who were responsible for underwriting the limited medical benefit policy for NBLA after the expiration of the USLIC group master policy with NBLA including, but not limited to, American Medical and Life

---

[2]While Allied Health Benefits, Inc. was a named Defendant in Plaintiff's original Complaint, Plaintiff has not included Allied Health Benefits, Inc. as a named Defendant in this First Amended Complaint and has dismissed it from the action without prejudice. Plaintiff makes this dismissal as to Allied Health Benefits, Inc., subject to an agreed upon tolling agreement between Plaintiff and Allied Health Benefits, Inc., following a series of meetings, discussions, and exchange of information between Plaintiff's counsel and counsel for Allied Health Benefits, Inc. addressing the current status and viability of Allied Health Benefits, Inc.

Insurance Company ("AMLI") and the Life Insurance Company of North America ("LINA"). These carriers continued the underlying scheme and conspiracy by providing and underwriting the limited coverage after the expiration of the USLIC policy. AMLI has been the subject of several regulatory actions and lawsuits involving the deceptive sale of its coverage as full, comprehensive medical insurance when it was not.[3] Likewise, LINA was investigated and named in the regulatory action brought by the Montana Insurance Commissioner. These additional underwriters agreed to the same conspiracy and continued the same practice of knowingly allowing their coverage to be sold by unlicensed producers and through deceptive means, just as USLIC did. At the time of Plaintiff's transaction and coverage period, USLIC was the underwriter of the coverage which was illegally and fraudulently sold as comprehensive individual medical coverage.

(4)     Principals and officers of the Telemarketing Defendants named herein including, but not limited to, Jess Jordan of National Healthcare Advisors and of Health Lead Systems, Inc.; Landon Jordan of Health Lead Systems, Inc.; and James Mike Douglas of Health Lead Systems, Inc. Upon information and belief, these

---

[3]*See, e.g.,* the Michigan Insurance Commissioner's action in *In the matter of American Medical and Life Insurance Company, et al.,* Enforcement Case No.: 12-11497; *see also David Knisely v. National Better Living Association, Inc., et al.,* United States District Court for the Northern District of West Virginia (Martinsburg Division), Case No.: 3:14-cv-00015-GMG.

principals and employees of the Telemarketing Defendants played an integral role in authorizing and implementing the systematic fraud utilized by the employees of the Telemarketing Defendants.  Additionally, the solicitors and individual telemarketers employed by these Telemarketing Defendants, whose identities are not currently known by Plaintiff, knowingly and intentionally engaged in the illegal conduct and deceptive practices described herein, and did so as representatives and agents of NBLA and USLIC.

### D. <u>How the Scheme and Conspiracy Were Perpetrated</u>.

32.

The significant problems consumers have experienced in recent years with "association plan" health insurance are well documented. *See, e.g.,* "Association Health Insurance: Is It Time to Regulate This Product?" Kofman, M. and Lucia K., M. NAIC's *Journal of Insurance Regulation,* Fall 2005 Vol. 24, No. 1.  Such associations must be organized for a specific purpose *other* than to sell health insurance. When coverage is sold through national associations, almost no consumer protections apply.

33.

NBLA purports to be one such association.  Set up as a non-profit with loose membership criteria, NBLA's true (and improper) purpose is to solicit, market, and

sell health insurance nationally to the insurance buying public. The health insurance sold by NBLA and its agents is purposefully bundled with other purported "benefits," such as travel discounts or pre-paid legal services, to obfuscate the association's *actual* purpose of soliciting and selling health insurance under the auspices of a "group association" or "group benefit," thus fostering a belief in consumers that the association coverage is "group" coverage with benefits and protections similar to job-based group insurance.

34.

NBLA, including its officers and principals, devised a scheme to target consumers who do not qualify for (perhaps due to pre-existing conditions) or otherwise cannot afford comprehensive health or major medical insurance. As part of its scheme and plan, NBLA would partner with a licensed insurance carrier who would underwrite a limited benefits policy for NBLA and its association members. With the carrier's knowledge, authorization and involvement, NBLA would then, directly and through its authorized agents/affiliates, market, solicit, and sell the coverage nationally to targeted consumers as though the insurance provided comprehensive medical coverage. Profits from buying consumers in the form of up front and monthly fees would be divided among the entities participating in the scheme, with the largest portion going to the carrier and NBLA.

23

35.

NBLA's targeted consumers were not previous members of the association, but instead automatically became members of the association when they purchased the junk insurance at issue herein, which was deceptively marketed and sold as comprehensive major medical coverage.

36.

To carry out the scheme, NBLA engaged an insurance brokerage firm, IMAC, to connect NBLA with an insurance carrier who would underwrite a limited benefits policy for NBLA and knowingly acquiesce, agree to, and approve of the illegal and deceptive manner in which the coverage would be marketed and sold to the buying public. IMAC, through its principal Edward Klayman, brought together and brokered a deal between NBLA and USLIC to this effect.  In turn, IMAC would receive a portion of the monthly fees for each USLIC coverage sold to consumers victimized by the illegal and deceptive practices described in this action.  Upon information and belief, IMAC was aware of, agreed to, and helped facilitate the deceptive and illegal conduct perpetrated on targeted consumers.

37.

NBLA entered into a master group contract with USLIC to underwrite certain "health" policies that provide poor coverage and limited benefits.  This group master

policy between NBLA and USLIC, Policy No. G610-242, was effective December 1, 2006 and, upon information and belief, expired on November 30, 2009. Further, USLIC entered into an agreement with NBLA (or NBLA's authorized agent/affiliate) whereby NBLA and NBLA's authorized agents/affiliates would market, solicit, and sell USLIC's coverage to consumers across the United States. Upon information and belief, USLIC had involvement and a degree of control over the means and methods by which USLIC's coverage would be marketed and sold by NBLA and NBLA's agents/affiliates. USLIC knew of, acquiesced in, and agreed to the deceptive and illegal tactics described herein that would be and were used to sell its coverage, including deceptive advertising in television, print, and internet by NBLA and its authorized agents/affiliates, the systematic and widespread fraud utilized by telemarketers employed to sell USLIC's coverage, and the use of unlicensed producers to market and sell USLIC's coverage. Indeed, following the Montana Insurance Commissioner's investigation, she found that "USLIC authorized or encouraged the practice of using unlicensed producers ... USLIC appears to have sanctioned the use of unlicensed solicitors in its agent marketing agreement with Timothy Siewert [of NBLA], and knew or should have known of solicitor misrepresentation, such as to indicate a general business practice." (Exhibit A.)

38.

NBLA and USLIC conspired and agreed to allow NBLA, directly and through NBLA's authorized agents/ affiliates, to market, solicit, and sell USLIC's limited coverage, including the use of deceptive and misleading tactics in television, print, and internet advertising.  For example, NBLA produced and nationally ran television ads which deceptively marketed the limited USLIC coverage as providing comprehensive health or major medical insurance to individuals who may not otherwise qualify for (perhaps due to pre-existing conditions) or who cannot afford it.  One NBLA television commercial touted "AFFORDABLE QUALITY HEALTHCARE" with "ACCEPTANCE GUARANTEED REGARDLESS OF PAST MEDICAL HISTORY," with real benefits including "DOCTOR VISITS, HOSPITALIZATION, ICU, SURGICAL, PRESCRIPTION DRUGS.... ."  These marketing tactics were designed and intended to lead consumers to believe that the insurance being offered by NBLA was real, comprehensive health or major medical insurance.  Upon information and belief, USLIC had knowledge, involvement, and a degree of control over the marketing tactics employed by NBLA and NBLA's agents/affiliates in marketing USLIC's coverage.  Similar advertisements by NBLA on the internet and in print made the same or similar representations, promising to, among other things, "pay benefits like a major medical insurance plan."

39.

Additionally, with USLIC's full knowledge and consent, NBLA, directly and/or through its authorized agent/affiliate, employed and entered into agreements with certain telemarketer "call centers" to market, solicit and sell USLIC's coverage. These call centers include National Health Advisors, Health Lead Systems, Inc. and Albert Cormier Solutions, LLC.   These Telemarketing Defendants, through their principals and employees, conspired and agreed to facilitate and participate in NBLA's and USLIC's intended scheme to use deceptive and illegal tactics in order to sell as many USLIC coverages as possible to vulnerable consumers.   These Telemarketing Defendants would solicit consumers directly via fake "get-a-quote" websites utilized by NBLA and/or its authorized affiliate, or take in-coming consumer calls in response to advertising by NBLA or NBLA's authorized agent/affiliate.

40.

These Telemarketing Defendants, with NBLA's and USLIC's knowledge and consent, utilized aggressive and deceptive marketing techniques and representations to sell what the consumer is led to believe is comprehensive health and major medical coverage.   These Telemarketing Defendants, acting as agents for NBLA and USLIC, will aggressively say whatever it takes to make the sale, including representations that are false, misleading or incomplete.

41.

These Telemarketing Defendants, with NBLA and USLIC's knowledge and consent, engaged in widespread, intentionally-misleading marketing which, among other things, misrepresented the USLIC coverage as comprehensive health plans providing major medical coverage, when in truth the policies were extremely limited and, as characterized by the former Insurance Commissioner of Maine in the Dateline NBC segment: "in reality, almost worthless ... people are essentially being sold an empty promise." As evidenced by the voluminous complaints and recollections of victimized consumers documented in the regulatory actions in Georgia and Montana, in other civil litigation, in Better Business Bureau complaints, and in the Dateline NBC segment, these deceptive and misleading representations were widespread, systematic and consistent. They included:

(1) representations that what was being offered and provided was real, comprehensive major medical coverage;

(2) representations that the coverage provided full and complete coverage for, and regardless of, any pre-existing conditions;

(3) representations that the coverage was comprehensive and covered most medical needs, including doctor's visits, prescription medications, outpatient procedures, lab work, etc., with only minimal co-pays and deductibles required of the insured;

(4) leading consumers to believe that the NBLA, including the NBLA authorized agent on the telephone line was, in fact, the insurance company, and that what was being sold was an insurance policy, not a membership into an association (as there is no mention of an association membership).

42.

These widespread and consistent telephone representations were false and were utilized to induce as many consumers as possible to purchase the USLIC coverage.

43.

These tactics and misrepresentations were not isolated or the product of one or more "rogue agents." These telemarketers were trained, encouraged, and required by their superiors to sell the USLIC coverage in this deceptive fashion. Indeed, in the Dateline NBC segment, an undercover investigator posing as a trainee is instructed by her principal at Health Lead Systems, Inc. that "we don't want to be too much of an educator ... I mean, sometimes when you're selling, less is more."

44.

This systematic use of deceptive tactics and misrepresentations by the Telemarketing Defendants utilized by NBLA and USLIC was known, approved, agreed to by NBLA and USLIC. These aggressive solicitors (who were not licensed to sell insurance) and their deceptive tactics were an integral component of the

scheme and conspiracy intended by USLIC and NBLA. These Telemarketing Defendants and their employees and principals were acting as agents of NBLA and USLIC when soliciting and making these insurance sales in the illegal and deceptive manner described in this action.

45.

These Telemarketing Defendants (and their employees) that were utilized by NBLA and USLIC to fraudulently market and sell USLIC's coverage were soliciting, marketing, and selling the USLIC insurance despite the fact that the Telemarketing Defendants and their solicitor/employees did not have required licenses or appointments to sell the insurance. Stated otherwise, NBLA and USLIC allowed, knew about, agreed to, and encouraged the use of unlicensed producers to market and sell the subject coverage. The regulatory actions in Montana and Georgia, as well as the Dateline NBC undercover film, demonstrate that the limited insurance was systematically marketed and sold by individuals who were not licensed to sell insurance. Indeed, in the Dateline NBC segment, Health Lead Systems, Inc.'s top selling solicitor, who is not a licensed insurance producer, is filmed making insurance sales and telling NBC's undercover trainee that "you don't have to know anything about insurance to do this," and further labeling her process of closing the insurance sale as "talking them into submission."

30

46.

NBLA and USLIC, through their telemarketing agents known by NBLA and USLIC to be unlicensed and engaged in widespread fraud, played upon the vulnerabilities of people who either could not qualify for, or could not afford, traditional major medical health insurance coverage by falsely representing the USLIC coverage as a low cost way to obtain such coverage.  These Defendants intentionally perpetrated a scheme and conspiracy to misrepresent the limited health insurance policies as comprehensive plans providing major medical coverage.

47.

The Telemarketing Defendants, including their employees and solicitors, were acting as agents of USLIC and NBLA in their marketing, solicitation, and sell of the USLIC coverage.  NBLA and USLIC knew of, agreed to, and acquiesced in the Telemarketing Defendants' widespread pattern and use of deceptive representations and unlicensed producers to market and make sales of USLIC's coverage.

48.

Once a consumer is induced to purchase the insurance by virtue of this deceptive conduct, the consumer's personal banking information is taken so that undisclosed "membership fees" and insurance premiums can be directly obtained from the consumer via debit or credit card, effective immediately, with monthly debits

thereafter. The materials subsequently mailed to the consumer by NBLA and USLIC, including deceptive "insurance cards," only further foster the deception and do nothing to negate the representation and consumer understanding that what is being provided is real, comprehensive medical coverage. As stated by the former Insurance Commissioner of Maine in the Dateline NBC segment: "you really have to have a PhD in insurance to understand the fine print of these policies."

49.

This deceptive scheme employed by the Defendants results in consumers, like Plaintiff, paying out of pocket money, typically around $200 a month, for useless coverage, usually at a time when they need legitimate, meaningful health insurance the most. Further, often times these improper practices leave consumers with substantial medical debt. The payments collected by NBLA were distributed among the Defendants in accord with their purposeful scheme, conspiracy, and unlawful Enterprise.

**E.  The Duration of the Scheme and Conspiracy.**

50.

Upon information and belief, this scheme and conspiracy has been perpetrated and ongoing since at least December 2006, has continued through at least late 2012, (as evidenced by the Georgia regulatory action), and is still ongoing today. As

previously alleged, USLIC provided the subject coverage per its Master Policy effective December 1, 2006 and expiring on November 30, 2009.  Even beyond November 30, 2009, USLIC continued in the perpetration of the scheme by routinely denying insurance claims that had been submitted by victims believing they had bona fide health insurance.

51.

After November 30, 2009, the underlying limited coverage was provided and underwritten by LINA and subsequently by AMLI pursuant to the same scheme, conspiracy and conduct previously described herein.

52.

The regulatory action by the Georgia Insurance Commissioner evidences that this scheme and the improper practices remained rampant and widespread through at least late 2012.  Upon information and belief, the scheme is still ongoing.

**F.  <u>The Scheme Was Widespread, Systematic and Part of a Related Pattern</u>.**

53.

As stated, the conduct and practices described herein, which were played upon the named Plaintiff (*see* section G of this Complaint), were not random or isolated events. Rather, they were part of an intentional and well designed pattern and scheme orchestrated by the Defendants in conspiracy and in agreement with one another. The

33

widespread and systematic nature of the scheme, pattern, and conspiracy is evidenced by, among other things:   the investigation of these practices by Insurance Commissioners in Montana and Georgia; the investigation and undercover reporting by Dateline NBC; other civil cases filed by victimized consumers; and countless complaints made by victimized consumers to Better Business Bureaus, consumer watchdog websites, and insurance departments across the United States.   This evidence shows that the manner in which the scheme operated was not only widespread, but was the regular way the Defendants did business.   Some of that evidence will be discussed below:

      **(i)**      **The investigation and regulatory action by the Montana Insurance Commissioner.**

54.

Following an investigation, in June 2011 the Montana Insurance Commissioner brought a disciplinary action against all of the Defendants named in this matter, as well as other participants and beneficiaries of the improper insurance scheme.   As alleged by the Montana Insurance Commissioner, all of these Defendants "are or were affiliated persons or entities who, in concert, transacted and distributed insurance or health related products in the State of Montana to 161 Montana insurance consumers since 2006 in a manner violative of Montana's insurance code."   (Exhibit A.)

Further, according to the Montana Insurance Commissioner, NBLA's "membership" consists of "insurance consumers who are seeking and who believe they are buying comprehensive health or major medical insurance instead of supplemental-type policies and limited medical benefits." The Montana Insurance Commissioner's action then goes on to address the Defendants' transactions and dealings with at least six (6) Montana consumers, including Carol Croteau, Renee Jones, and Keith Moore. Like the Plaintiff in this action, all of these consumers were subjected to, and induced by, deceptive representations made by unlicensed solicitors acting on NBLA's and USLIC's behalf, including consistent representations that the subject coverage provided real, comprehensive health coverage, including coverage for any pre-existing conditions. According to the Montana Insurance Commissioner, the Defendants falsely represented that "the NBLA products provided health insurance coverage or other benefits within the reasonable expectations of Montana insurance consumers." The Montana victims "told investigators that telemarketers promised that the insurance would provide full coverage for all pre-existing conditions." (Exhibit A.)

55.

The Montana Insurance Commissioner's action resulted in substantial fines and the cessation of these practices in Montana. In her press release announcing the

35

settlement, Montana Insurance Commissioner Monica Lindeen stated: "Association scams are one of the worse insurance scams operating today. By leading people to believe that they had the full coverage of major medical health insurance, these scams damaged not only their victim's wallets, but their health." (Exhibit A.)

56.

Some of the victims referenced in the Montana Insurance Commissioner's action subsequently brought civil litigation against the Defendants and others, asserting, among other claims, RICO violations for a pattern of mail and wire fraud, which survived a motion to dismiss brought by the Defendants in this action. *Carol Croteau, et al. v. The National Better Living Association, Inc.; The United States Life Insurance Company in the City of New York, et al.,* United States District Court for the Northern District of Montana (Missoula Division), Case No.: CV-12-200-M-DWM.

(ii)   **The Dateline NBC investigative segment.**

57.

On March 26, 2012, the television program Dateline NBC broadcast an investigative segment focusing on this specific insurance scheme. The segment not only provides an in-depth analysis of how the scheme was perpetrated, but it also provides a visual glimpse into the internal operations and deceptive practices of the

36

hired telemarketing agents, including Health Lead Systems.   As part of its investigative piece, Dateline NBC equipped its staffers with hidden cameras to seek, and ultimately obtain, a telemarketing sales position with Health Lead Systems.

58.

The Dateline NBC investigative segment which was broadcast on March 26, 2012 can be viewed on www.nbcnews.com/video/dateline/46860128/#46860128.

59.

In the Dateline NBC investigative segment, these telemarketing agents can be seen and heard informing consumers, via telephone, that they were completely covered, regardless of any pre-existing conditions, and that the coverage was comprehensive medical coverage.   In one portion of the segment, an undercover Dateline NBC staffer calls Health Lead Systems disguised as a potential consumer. This undercover consumer makes it clear to the telemarketing agent that he wants comprehensive medical insurance.   The telemarketer describes the coverage that the consumer will be getting as something that will cover him if anything catastrophic were to happen.   The former Maine Insurance Commissioner who views these representations by videotape states on record that what is being told to consumers is clearly deceptive.   She states that based on what the solicitor is saying, "the consumer is of the mindset that this is comprehensive medical coverage."

60.

The Dateline NBC segment also shows through visible evidence that these deceptive practices are not random or isolated. Rather, telemarketing solicitors are trained and encouraged to deceptively market and sell the subject insurance in this fashion. In one training session filmed undercover, the trainee's supervisor states "we don't want to be too much of an educator…I mean, sometimes when you are selling, less is more." Speaking to the undercover NBC staffer on hidden camera, Health Lead System's top salesperson states "you don't have to know anything about insurance to do this," and characterizes her process of closing insurance sales as "talking them into submission."

61.

In the Dateline NBC segment, New York Superintendent of Financial Services Ben Lawsky states that it is not just NBLA and the call centers that are to be held accountable - - - ultimately, according to Ben Lawsky, it comes down to the underwriter who writes the insurance plan. Lawsky states: "the insurance company has a corporate responsibility - - - they are ultimately on the hook for all of this. People are being deceived about these products."

### (iii) The investigation and regulatory action by the Georgia Insurance Commissioner.

62.

Also in 2012, the Georgia Insurance Commissioner conducted an investigation into the practices, transactions, and course of business engaged in by NBLA, its officers, affiliates, hired call centers, and its underwriting insurance carriers. (Exhibit B to this Complaint.)

63.

Consistent with the misrepresentations made to Plaintiff, to the Montana consumers identified in the Montana action, and to other consumers across the country, the regulatory action by the Georgia Insurance Commissioner describes how targeted consumers were deceptively told that the coverage offered constituted comprehensive medical coverage as opposed to coverage with limited benefits. As the Georgia Insurance Commissioner alleged: "as part of the telephone solicitation, individuals soliciting on behalf of NBLA refer to the coverage sold under NBLA's 'expanded memberships' as something other than a limited medical benefits policy, such as a 'high risk plan that covers all major things,' thereby confusing consumers and misrepresenting the type of policy under which a prospective member will receive coverage." (*See* Exhibit B to this Complaint.)

39

64.

To further demonstrate the related pattern of the insurance scheme, the Georgia Insurance Commissioner's regulatory action describes the misrepresentations made to the Montana consumers addressed in the Montana regulatory action. The Georgia Insurance Commissioner then describes the misrepresentations made in transactions involving several consumers, including the deceptive misrepresentations made by NBLA's telemarketers to the following Georgia consumers: Linda Yancey, Cynthia Sims, Nancy Brand, Glenda Neese, Janet Keeler, Dianja McMillan, Donna McLain, John Grecco; to the following Virginia consumers: Ronald Woods, Brenda Cosner; to consumer Wesley Hoy of Florida; and consumer Barbara Stemmler of Pennsylvania. Consistent with the telephone misrepresentations made to Plaintiff and to the consumers described in the Montana regulatory action, these telemarketers, including the Telemarketing Defendants, made misrepresentations on behalf of NBLA and the insurance carrier consisting of, but not limited to: (1) that the coverage being offered and provided was real, comprehensive major medical coverage; (2) that the coverage provided full and complete coverage for, and regardless of, any pre-existing conditions; (3) that the coverage was comprehensive and would cover most medical needs, including doctor's visits, prescription medications, etc. with only minimal co-pays and deductibles; (4) leading consumers to believe that NBLA,

including the NBLA authorized agent on the telephone line was, in fact, the insurance company, and that what was being sold was an insurance policy, not a membership into an association; (5) that the insurance coverage being offered was comparable to a "80/20" health insurance plan, when in truth the benefits were far more limited than a traditional "80/20" plan.  (Exhibit B.)

65.

These representations made to the consumers described in the Georgia regulatory action, which caused these consumers to act to their detriment, are consistent with the misrepresentations made to Plaintiff, to the Montana consumers, and to other consumers across the country.  The misrepresentations were an integral part of a pattern, general business practice, and related series of transactions by related entities against targeted consumers.

66.

While not describing the details of the transactions or misrepresentations, the Georgia regulatory action goes on to identify no less than 385 additional Georgia consumers by name and zip code who were sold insurance coverage as a result of the scheme to demonstrate that insurance was consistently, and as part of a pattern and practice, sold by unlicensed and unappointed producers.

41

67.

Upon information and belief, the regulatory action by the Georgia Insurance Commissioner resulted in significant fines and settlements.

68.

Complaints from consumers in other civil litigation,[4] from complaints made to Better Business Bureaus, and from the volumes of complaints found on consumer watchdog websites further evidence the related pattern of this scheme over the years. Commenting on complaints made to the Better Business Bureau, the Georgia Insurance Commissioner stated in his regulatory action: "the Better Business Bureau currently has approximately 300 complaints regarding NBLA and its affiliates listed in its database from consumers nationwide. A majority of these complaints involve misrepresentations made to consumers during the sale, solicitation, or negotiation of an NBLA 'expanded membership'." (Exhibit B)  Further, the Better Business Bureau just for the Metro Atlanta area states the following regarding NBLA: "BBB files indicate that this business has a pattern of complaints, with consumers alleging: ... that they were misled into believing they were purchasing major medical insurance; ...they were misled to believe their prescriptions would be covered ... an example is

---

[4]*See*, for example, *David Knisely v. National Better Living Association, Inc., et al.*, United States District Court for the Northern District of West Virginia (Martinsburg Division), Case No.: 3:14-cv-00015-GMG.

complaints that allege consumers disclosed pre-existing medical conditions and were assured coverage was available."

## G. Plaintiff's Transaction.

### 69.

Plaintiff is a 57-year-old citizen residing in St. Clair County who was in need of individual health insurance. In early February 2009, Plaintiff began looking for affordable, individual comprehensive health insurance coverage. On February 15, 2009, Plaintiff conducted an internet search from her home for such coverage. She viewed a webpage maintained by NBLA purporting to offer and sell real, individual health policies. The webpage falsely purported to offer real health insurance providing extensive medical coverage, including "doctor's visits, hospitalization, prescription drugs." The webpage used words and phrases indicating that the available individual health insurance was comprehensive in scope and provided extensive benefits for major medical coverage, including "complete quality healthcare" and "all medical conditions accepted." Based on the representations contained on this webpage, Plaintiff believed what was being offered and advertised could suit her needs, and she proceeded to complete online information needed in order to receive a quote.

70.

After Plaintiff provided the requested information online, on the afternoon of February 15, 2009 she received a call at her home from a telemarketer agent in response to the online information she provided. This telemarketer was female and stated she was calling from Texas. This telemarketer was, upon information and belief, an employee for one of the Telemarketing Defendants that were utilized by NBLA and USLIC to solicit and sell the USLIC coverage as described herein. The exact identity of this individual telemarketer who transacted with Plaintiff, and the Telemarketing Defendant she was working for, are, upon information, within the records and knowledge of the Defendants and will be obtained in discovery. This telemarketing agent marketed and sold Plaintiff the subject coverage on behalf of NBLA and USLIC.

71.

The telemarketing agent who contacted Plaintiff said nothing about an association, and instead gave the impression that she was with a health insurance company, thereby leading Plaintiff to believe that she was communicating and dealing with a health insurance company. In this telephone conversation, the telemarketer agent represented that what they could provide was affordable, "full" health insurance with extensive medical benefits. Plaintiff specifically requested and expressed her

44

desire for comprehensive, major medical individual health insurance. The telemarketing agent represented to Plaintiff that comprehensive, major medical coverage is what would be provided, and that the most comprehensive coverage would come from the "Premiere 1000" insurance plan. The telemarketing agent represented to Plaintiff that the coverage from the "Premiere 1000" plan would cover doctor's visits (with no limit on doctor's visits within the carrier's PPO network), lab work, prescription drugs, hospital stays, ambulance services, and other occurrences. She further described the coverage as being an "80/20" insurance plan, whereby the insurance would cover 80% of medical bills. Plaintiff specifically inquired about coverage for existing medical conditions, and the agent represented to Plaintiff that comprehensive health coverage would be provided regardless of past medical history or any pre-existing conditions. The agent represented that although the "Premiere 1000" insurance plan was more expensive, it provided the most comprehensive medical coverage for Plaintiff.

72.

The telemarketing agent did nothing to negate Plaintiff of the notion that she was purchasing real, comprehensive health insurance. The telemarketing agent intentionally suppressed and omitted material facts from Plaintiff to induce the sale, including the fact that the coverage being sold was not, in fact, comprehensive

45

medical coverage, but instead was very limited in nature. Despite inquiry by Plaintiff, the telemarketing agent failed to disclose the fact that the subject insurance was extremely limited and would not cover the cost incurred to treat any kind of injury or illness. These facts involving the core terms of coverage were obviously material and important to Plaintiff, causing her to rely to her detriment.

73.

These misleading representations from the telemarketing agent and website described above induced Plaintiff to purchase the limited insurance underwritten by USLIC, which Plaintiff believed to be real, comprehensive health insurance. She proceeded with the purchase via telephone with this telemarketing agent in the same February 15, 2009 phone call. The telemarketing agent obtained Plaintiff's banking/debit card information for the first month's payment and subsequent monthly payments, which were over $200 a month.

74.

NBLA and/or its authorized agent/affiliate did, in fact, debit Plaintiff's account each month for the USLIC coverage and undisclosed membership/association fees.

75.

Plaintiff never received a copy of her health insurance policy, but she did receive from NBLA by U.S. Mail what purported to be an "insurance card" from

NBLA for the "Premiere 1000" plan and correspondence from NBLA, all of which further fostered Plaintiff's belief that she had health coverage.   The NBLA correspondence alluded to "peace of mind" in being covered, and neither NBLA's correspondence nor its "insurance card" did anything to negate the representation and Plaintiff's understanding that what she had purchased was comprehensive, individual health insurance, just as Plaintiff was told.

76.

As a result and proximate cause of this scheme, Plaintiff incurred expenses and damages in the form of monthly payments to NBLA for illusory coverage and illegal "membership" dues, along with other economic and non-economic damages.   The payments were deducted monthly from Plaintiff's bank by NBLA and/or its authorized agent/affiliate for what had been represented as, and what Plaintiff believed, was comprehensive medical coverage.   Upon information and belief, the proceeds from Plaintiff's monthly payments were distributed among the Defendants in accord with their scheme and Enterprise, with the largest monthly portion going to USLIC.

77.

Upon information and belief, thousands of other consumers across the United States were also victimized and damaged by the Defendants in this same manner as

47

Plaintiff.

## V. CLASS ACTION ALLEGATIONS

78.

Plaintiff brings this action pursuant to Federal Rules of Civil procedure 23(a) and 23(b)(1), (b)(2) and (b)(3) on behalf of herself and a nationwide Class consisting of:

> All consumers in the United States who paid money for coverage under the NBLA/USLIC Group Master Contract, Group Policy No. G-610, 242.

79.

The Class excludes Defendants and any entity in which any defendant has a controlling interest, and their officers, directors, legal representatives, successors and assigns.

80.

The Class is so numerous that joinder of all members is impracticable.

81.

A Class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

82.

Plaintiff's claims are typical of the claims of the Class.

83.

There are questions of law and fact common to the Class, including but not limited to:

a. Whether the Defendants engaged in an improper scheme to solicit, market and sell worthless, junk insurance;

b. Whether the Defendants profited from the improper conduct challenged herein;

c. Whether the Defendants' "association" insurance scheme constituted a pattern of racketeering activity;

d. Whether NBLA and USLIC breached the terms of agreements with Plaintiff and putative class members;

e. Whether the Defendants have been unjustly enriched;

f. Whether the Defendants are liable to Plaintiff and the class for damages and, if so, the measure of such damages.

84.

These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.

85.

Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has no claims antagonistic to those of the Class. Plaintiff has retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation. Plaintiff's counsel will fairly, adequately and vigorously protect the interests of the Class.

86.

Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

87.

Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

88.

Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

89.

Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common tot he members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I
## Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1962(c) (Against All Defendants)

90.

Plaintiff adopts and incorporates ¶¶1 - 89 of this Complaint as if set out fully in this Count.

91.

Plaintiff, each class member, and each named Defendant are "persons," as that term is defined in 18 U.S.C. §§1961(3) and 1962(c).

92.

The RICO "Enterprise" is an association-in-fact, as that term is defined in 18 U.S.C. §§1961(4) and 1962(c), consisting of each of the Defendants named in this action, including their employees, principals, and agents.  For example, the actual telephone solicitors/individuals who were employed by the Telemarketing Defendants named herein, as well as their superiors, are also part of the Enterprise.  Likewise, the officers and principals of NBLA are part of the Enterprise, as are employees of USLIC who were involved in the NBLA relationship and the scheme and conspiracy that was perpetrated.

93.

The RICO Enterprise also consisted of other persons and entities not named as Defendants herein, but identified in this Complaint in ¶31.  For example, the Enterprise also consisted of other persons or entities who took actions on behalf of NBLA, including Allied Health Benefits, Inc. and CorpSavers.

94.

The manner in which each Defendant participated in the affairs of the Enterprise and the perpetration of the scheme, along with the misconduct and basis of liability of each Defendant in the Enterprise, are previously set forth in detail in this Complaint.

95.

These participants that constitute the Enterprise were associated for, and share, the common purpose of fraudulently and illegally procuring insurance premiums and "membership fees" from consumers for worthless, junk insurance that was sold, marketed, and solicited by unlicensed producers as comprehensive major medical coverage. The Enterprise's purpose was to induce consumers to pay money in this regard. As alleged throughout this Complaint, the proceeds of the Enterprise were distributed to and among its participants, including those Defendants named herein.

96.

The facts and evidence described throughout this Complaint show that the Enterprise functions as a collective unit to perpetrate the scheme to defraud described herein. The Defendants are co-conspirators and rely on one another in a symbiotic relationship to perpetrate the scheme: NBLA (and its agents) needed and utilized an underwriter of some form of limited benefit insurance so it could market and sell coverage as comprehensive health insurance; USLIC needed and utilized a network to market and sell its worthless (yet profitable) limited benefits coverage; NBLA and USLIC needed and utilized a network of aggressive telemarketing companies to make "sales" at all costs; and so forth. The insurance scheme is perpetrated by the Defendants as a collective unit in conspiracy with one another. Each Defendant

53

participated in the operation and conduct of the affairs of the Enterprise in the manner described throughout this Complaint, and benefitted monetarily from the operation of the Enterprise.

97.

The Enterprise affects interstate commerce in a variety of ways. The Enterprise utilizes interstate wires and mail to carry out its purpose and reap benefits for the Enterprise. The Defendants, as participants in the Enterprise, are located in different states and conduct the affairs of the Enterprise, including the insurance scheme described in this action, on a national basis throughout the United States.

98.

As previously alleged, the Enterprise has operated from at least December 2006 to the latter part of 2012 (as evidenced by the Georgia regulatory action) and, upon information, still operates to this day, as some victims of the scheme still pay money to NBLA for the "membership" and coverage, and unknowing victims continue to have claims submitted and denied.

99.

At all relevant times, in violation of 18 U.S.C. §1962(c), the Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity as defined in RICO, 18 U.S.C. §1961(5). This pattern consists of more than two (2) acts

54

of racketeering activity, the most recent of which occurred within ten (10) years after the commission of a prior act of racketeering activity.

100.

The racketeering activity includes a related pattern of wire fraud, mail fraud, and bank fraud in violation of 18 U.S.C. §§1341, 1343, and 1344.

101.

Mail or wire fraud occurs when a person intentionally participates in a scheme to defraud another of money, and uses the mail or wires in furtherence of that scheme. In this case, the United States mail and wires were, in fact, used to further the scheme described in this action. As previously alleged herein, deceptive webpages and television advertisements were utilized to steer and induce consumers, like Plaintiff, into the scheme; the mails were used in sending deceptive written materials, correspondence, purported "insurance cards," and other documents furthering the overall insurance scheme described herein; mail and wires were used to obtain money from consumers duped by the scheme, which the Defendants shared; and, of course, the systematic practice and use of telemarketers to make, and known by NBLA and USLIC to be making, widespread misrepresentations to consumers, including Plaintiff, about the coverage being sold (as described herein) is conduct constituting racketeering activity. The manner in which each Defendant engaged in this scheme

to defraud and these racketeering activities is described throughout this Complaint.

102.

Bank fraud occurs when a person knowingly executes, or attempts to execute, a scheme or artifice to obtain any of the moneys, funds, credits, assets, or other property under the custody or control of a financial institution by means of false or fraudulent pretenses, representations, or promises. The conduct described herein of debiting credit and bank accounts of consumers, including Plaintiff, victimized by the fraudulent scheme described herein constitutes bank fraud. Upon information and belief, the most common and prevalent manner in which victims paid for the subject bogus coverage was through bank account electronic debiting.

103.

Plaintiff was subjected to these predicate acts, as were other victimized consumers described in this action.

104.

A pattern of racketeering activity is established if there have been at least two (2) acts of racketeering activity within the past ten (10) years. Here, the allegations of the Plaintiff, as well as other victimized consumers across the country referenced herein, demonstrate a pattern of racketeering activity played upon numerous consumers in a series of transactions across the United States. The racketeering

activities played upon Plaintiff were also played upon numerous other consumers, as described and referenced in this Complaint. The evidence regarding other victimized consumers referenced herein demonstrates the systematic pattern of these racketeering activities. Further, these acts of racketeering activity are related to the same Enterprise whose objective is to obtain money from consumers who are sold junk insurance through deceptive and illegal means.

105.

These acts of racketeering activity have the same method of commission in that they were the systematic way in which the Enterprise conducted its scheme to defraud. In fact, these acts of racketeering activity were part of the regular way of doing business by the Defendants, as the pattern and series of transactions described in this action demonstrate. The acts of racketeering activity have the same objective: obtaining monies and profits from consumers. The acts of racketeering activity have similar victims, including consumers like Plaintiff and other class members who were seeking, and believed they were purchasing, real, comprehensive individual health insurance. These acts of racketeering activity were designed and carried out to perpetrate racketeering with respect to a series of bogus sales - - - indeed, as many sales as the Defendants could possibly make to consumers across the country. This series of related racketeering activity began, upon information and belief, in

57

December 2006.

106.

Through their nationwide scheme, the Defendants have committed thousands of violations of 18 U.S.C. §§1341, 1343, and 1344 as part of their pattern of racketeering activity.

107.

Each Defendant participated in the scheme to defraud knowingly, wilfully, and with a specific intent to defraud consumers into paying premiums and fees for worthless, junk insurance marketed and sold as comprehensive medical coverage.

108.

As a direct and proximate result of the Defendants' violations of 18 U.S.C. §1962(c), Plaintiff and the class have been injured in their business or property within the meaning of 18 U.S.C. §1964(c).  Plaintiff and class members paid premiums and membership fees as a result of the scheme.  Pursuant to 18 U.S.C. §1964(c), the Defendants are jointly and severally liable to Plaintiff and the class for three (3) times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## COUNT II
### Conspiracy to Violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(d)
### (Against All Defendants)

109.

Plaintiff adopts and incorporates ¶¶1 - 108 of this Complaint as if set out fully in this Count.

110.

Liability for a conspiracy to violate RICO can attach if the Defendant agreed to the overall objective of the conspiracy, or by showing the Defendant agreed to commit two (2) predicate acts. In this case, each Defendant named in this action agreed to the overall objective of the conspiracy. The objective of the conspiracy was to obtain monies from consumers by illegally and deceptively selling the subject coverage as comprehensive major medical coverage when it was not. Each Defendant agreed to the overall objective of this conspiracy in, upon information and belief, 2006. Upon information and belief, there was an illegal and direct agreement among the Defendants in this regard or, at a minimum, this agreement to the overall objective of the conspiracy can be inferred from the conduct of the Defendants that has been described in detail in this Complaint.

111.

Further, Defendants NBLA, USLIC, and the Telemarketing Defendants all made an illegal agreement by and among one another to conduct the pattern of wire fraud, mail fraud, and bank fraud previously alleged and described. As previously alleged, NBLA and USLIC illegally conspired and agreed with one another to solicit, market and sell USLIC's coverage through deceptive means and with unlicensed producers as described herein, including through means which constitute wire fraud, bank fraud, and mail fraud. Further, USLIC and NBLA illegally conspired and agreed with the Telemarketing Defendants named herein to conduct and allow unlicensed producers to sell the subject coverage on NBLA's and USLIC's behalf. That is, USLIC and NBLA conspired and agreed with the Telemarketing Defendants to make sales of the subject coverage through unlicensed producers and through the aggressive, deceptive conduct described throughout this Complaint. USLIC and NBLA conspired and agreed with the Telemarketing Defendants to commit the widespread wire fraud discussed herein played upon Plaintiff and other consumers across the United States. As previously alleged, the Telemarketing Defendants were acting as agents for NBLA and USLIC in deceptively and illegally marketing and selling the USLIC coverage.

112.

As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §1962(c), Plaintiff and the Class have been and are continuing to be injured in their business and property in an amount to be determined at trial.  Such injuries included, but are not limited to, paying premium and fees with respect to the junk insurance as a direct, proximate and foreseeable result of the scheme alleged herein.

113.

Under the provisions of 18 U.S.C. §1964(c), Defendants are jointly and severally liable to Plaintiff and the class for three (3) times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## COUNT III
### Breach of Contract
### (Against Defendants NBLA and USLIC)

114.

Plaintiff adopts and incorporates ¶¶1 - 113 of this Complaint as if set out fully herein.

115.

Defendants NBLA and USLIC had a contractual obligation to provide comprehensive health insurance coverage to consumers who agreed to purchase the

subject USLIC coverage.

116.

Defendants NBLA and USLIC breached this contractual obligation by failing to provide comprehensive health insurance, instead only providing a limited medical benefit.  Further, the subject USLIC limited benefit coverage is void because it was procured illegally, thus warranting premium refunds to Plaintiff and class members.

117.

As a result of Defendants' breach of contractual obligations, Plaintiff and class members incurred damages in the form of premiums and membership fees paid for worthless, junk insurance, as well as other economic and non-economic damages.

**COUNT IV**
**Common Law Restitution/Unjust Enrichment/Disgorgement**
**(Against All Defendants)**

118.

This claim is pled in the alternative to Plaintiff's Breach of Contract claim. Plaintiff adopts and incorporates all previous allegations, except for those contained in Plaintiff's Breach of Contract claim above.

119.

Plaintiff and the class members have conferred a substantial benefit upon Defendants derived from the insurance premiums and fees discussed herein.  These

62

benefits came at the expense of Plaintiff and the class members.

120.

The circumstances are such that, in equity and good conscious, restitution should be made by Defendants to Plaintiff and class members.

121.

As a result of Defendants' unjust enrichment, Plaintiff and the class have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged herein.

122.

Plaintiff and the class are entitled to restitution and/or disgorgement of profits realized by Defendants as a result of their unfair, unlawful, and deceptive practices.

**COUNT V**
**Common Law Fraud and Suppression**
**(Against Defendants NBLA, USLIC, and the Telemarketing Defendants)**

123.

Plaintiff adopts and incorporates ¶¶1 - 122 of this Complaint as if set out fully herein.

124.

The misrepresentations made to Plaintiff as described in ¶¶69 - 77 of this Complaint constitute actionable fraud under the common law, and those representations caused Plaintiff to rely to her detriment and agree to purchase the subject USLIC coverage and NBLA membership.   As previously alleged, the misrepresentations made to Plaintiff by NBLA and by the Telemarketing Defendants were made on behalf of, and as agents for, NBLA and USLIC.   Further, these Defendants had a duty not to suppress and omit material information from Plaintiff, including the fact that the subject USLIC coverage did not provide comprehensive medical coverage, but instead was extremely limited in nature.   Defendants had a duty to disclose this material information to Plaintiff, but did not, causing Plaintiff to rely to her detriment.

125.

As a result of the Defendants' fraud and suppression, Plaintiff and the class have sustained damages in an amount to be determined at trial, and seek all available compensatory and punitive damages against the Defendants.

**PRAYERS FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court enter a judgment against Defendants and in favor of Plaintiff and the class and award the following relief:

a.     For an order declaring that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and for an order certifying this case as a class action and appointing Plaintiff as representative of the Class;

b.     For an order awarding compensatory damages on behalf of Plaintiff and the class in an amount to be proven at trial;

c.     For judgment for Plaintiff and the class on their claims in an amount to be proven at trial, for compensatory damages caused by Defendants' deceptive practices; along with exemplary damages to each class member for each violation;

d.     For judgment for Plaintiff and the class on their RICO claims, in an amount to be proven at trial, for three (3) times the amount of charges paid to Defendants by Plaintiff and the class;

e.     For restitution of all improperly collected charges and interest, and the imposition of an equitable constructive trust over all such amounts for the benefit of Plaintiff and the class;

f.     For pre-judgment and post-judgment interest as provided for by law or allowed in equity;

g.     For an order awarding Plaintiff and the class their attorneys' fees and costs; and

h.     Such other and further relief as may appear necessary and appropriate.

## JURY TRIAL DEMANDED

Pursuant to Federal Rules of Civil Procedure 38, Plaintiff demands a trial by jury of the claims alleged herein.

/s/ R. Brent Irby
R. Brent Irby

OF COUNSEL:
Charles A. McCallum, III
McCALLUM, HOAGLUND, COOK & IRBY, L.L.P.
905 Montgomery Highway
Suite 201
Vestavia Hills, Alabama 35216
Telephone: (205)824-7767
Facsimile: (205)824-7768
Email: birby@mhcilaw.com
       cmccallum@mhcilaw.com

## CERTIFICATE OF SERVICE

This is to certify that on February 24, 2014, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which automatically notifies counsel as follows:

Jeffrey M. Grantham
David P. Donahue
Lee E. Bains, Jr.
Lorrie L. Hargrove
Prim F. Escalona
MAYNARD, COOPER & GALE, P.C.
1901 Sixth Avenue North
2400 Regions/Harbert Plaza
Birmingham, Alabama 35203-2602
Telephone: (205)254-1000
*Attorneys for Defendant The United States Life Insurance Company in the City of New York*

Lewis E. Hassett
Patrick L. Lowther
MORRIS, MANNING & MARTIN, LLP
3343 Peachtree Road NE
Suite 1600
Atlanta, Georgia 30326
Telephone: (404)233-7000
*Attorneys for Defendant National Better Living Association, Inc.*

Clifton E. Slaten
SLATEN LAW PC
5960 Carmichael Place
Suite 200
Montgomery, Alabama 36117
Telephone: (334)396-8882
*Attorney for Defendant Albert Cormier Solutions, LLC*

Health Lead Systems, Inc.
c/o Jess Jordon, Owner
7996 E. Mansfield Highway
Kennedale, Texas 76060
*Attorney for Defendant Health Lead Systems, Inc.*

/s/ R. Brent Irby
COUNSEL

**Please serve Defendants via Certified Mail/Return Receipt Requested as follows:**

National Healthcare Advisors, LLC
c/o John R. Couvillon, Registered Agent
5887 Glenridge Drive
Suite 200
Atlanta, Georgia 30328

International Marketing, Administration and Insurance
Brokerage Corporation of Massachusetts
c/o Edward Klayman, Registered Agent
3 Kay Drive
Randolph, Massachusetts 02368