FILED

2014 Jul-29  PM 03:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **JACQUELYN WEAVER,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **CIVIL ACTION NO.** |
| | * | **4:13-CV-2112-VEH** |
| **THE NATIONAL BETTER LIVING** | * | |
| **ASSOCIATION, INC.; THE UNITED** | * | |
| **STATES LIFE INSURANCE** | * | |
| **COMPANY IN THE CITY OF NEW** | * | |
| **YORK; NATIONAL HEALTHCARE** | * | |
| **ADVISORS; ALBERT CORMIER** | * | |
| **SOLUTIONS, LLC,** | * | |
| | * | |
| **Defendants.** | * | |

## SECOND AMENDED CLASS ACTION COMPLAINT

COMES NOW, Plaintiff Jacquelyn Weaver, on behalf of herself and a putative class of similarly situated persons as defined herein, and hereby files the following Second Amended Class Action Complaint against Defendants The National Better Living Association, Inc.; The United States Life Insurance Company in the City of New York; National Healthcare Advisors; Albert Cormier Solutions, LLC; and, upon investigation, due diligence, and information and belief, alleges as follows:

## I. NATURE OF THIS ACTION

1.

This action challenges a nationwide insurance scheme and conspiracy carried

out by the Defendants to enrich themselves at the expense of vulnerable consumers seeking individual health insurance. As described more fully herein, the Defendants, in conjunction and conspiracy with each other, knowingly and intentionally carried out a scheme to deceptively market and sell certain worthless junk insurance through the illegal use of unlicensed and predatory "tell them anything" telemarketing agents. These telemarketing agents were known by the Defendants to be unlicensed and utilizing misleading tactics to sell the junk insurance at issue in this action.

<div align="center">2.</div>

As described more fully herein, the scheme is carried out through the use of a dubious "group association," which is nothing more than a subterfuge to evade regulatory oversight. Then, as part of the association's purported "group benefit," certain worthless, junk insurance underwritten by United States Life Insurance Company in the City of New York ("USLIC") was knowingly, purposefully, illegally, and deceptively sold as meaningful comprehensive health insurance.[1]  With the

---

[1]As used herein throughout this Second Amended Complaint, Plaintiff's references to "comprehensive" health insurance, "meaningful" health insurance, or "major" health insurance means and refers to real, traditional health insurance that covers (in full or up to a majority percentage amount) essential and customary health benefits, such as treatment by primary care physicians, doctors visits, hospitalization, emergency room visits, surgery, prescription medication coverage, lab work, and other similar customary benefits/coverages that are commonly associated with health care coverage, with the insured expectation that co-pays and/or deductibles are required of the insured. This was the understanding Plaintiff had of the insurance marketed and sold to her by Defendants, and her understanding was based on the misleading representations described herein.

<div align="center">2</div>

association's and the underwriter's full knowledge and consent, aggressive telemarketers who were in no way licensed to sell insurance coverage were intentionally utilized to deceptively market and sell the bogus insurance as agents for the association and the underwriter. Through the use of deception in phone calls, internet advertising, print media, television advertising, and written materials, the subject insurance was marketed and sold as real, comprehensive, individual health insurance. In truth, the coverage is extremely limited and essentially worthless, thus often leaving consumers with substantial unpaid medical bills and medical debt.[2]

3.

This scheme and conspiracy, which reaped substantial profits for the Defendants which they distributed among themselves, was played upon the named Plaintiff and, over at least the past seven (7) years, over thousands of other vulnerable consumers across the United States. Indeed, the illegal scheme described herein was

---

[2]Throughout this Complaint, Plaintiff's references to "limited medical benefits," and to the limited insurance product Defendants' deceitfully sold to Plaintiff, means and refers to an insurance product that does not cover those essential and customary benefits as described above in FN#1, but instead provides purported "benefits" that are so extremely limited and worthless such that the insurance provides no medical coverage at all, rendering the insurance meaningless. It further means and refers to a sham insurance product that does not pay claims for/to its insureds. Indeed, evidence from the regulatory and civil matters against Defendants in Montana indicates that between 2006 and 2009 only **0.5%** of the amount of **all** health insurance claims submitted by NBLA members in Montana under the USLIC policy were paid, thus evidencing the illusory nature of the product which was sold as a result of the scheme to defraud described herein. As stated by the former Maine Insurance Commissioner in the Dateline NBC segment: "[The insurance], in reality, is almost worthless - - - people are essentially being sold an empty promise."

so rampant and widespread that in 2011 it sparked a comprehensive investigation and regulatory action against these Defendants by the Montana Insurance Commissioner, resulting in significant fines and the cessation of the scheme in Montana. (*See* Exhibit A to this Complaint.) As stated by Montana's Insurance Commissioner, Monica J. Lindeen: "Association scams are one of the worst insurance scams operating today. By leading people to believe they had the full coverage of major medical health insurance, these scams damaged not only their victims' wallets, but their health. This case should send a clear message to scammers who would follow in their footsteps: not in Montana." (Exhibit A to this Complaint.) Similarly, this scam sparked a comprehensive investigation and regulatory action by the Georgia Insurance Commissioner, which also resulted in significant fines and the cessation of the scheme in Georgia. (Exhibit C to this Complaint.) Additionally, the scheme and conspiracy challenged in this action were the subject of a disturbing and revealing investigative segment broadcast nationally on Dateline NBC on March 26, 2012. In the Dateline NBC investigative segment, the operation of this scheme was analyzed in detail, with undercover film showing the illegal operation in motion. The Dateline NBC investigative segment can be viewed at www.nbcnews.com/video/dateline/46860128/#46860128.

4.

In this action, Plaintiff seeks redress on behalf of herself and others similarly situated who were victims of this bogus insurance scam intentionally carried out by the Defendants in conspiracy with one another. As described herein, the Defendants' widespread use of interstate wires and United States mail were integral in carrying out the scheme, and thus Plaintiff asserts claims for violations of the federal Racketeering Influence and Corrupt Organizations Act ("RICO").

## II. PARTIES, JURISDICTION, AND VENUE

5.

Plaintiff Jacquelyn Weaver ("Plaintiff") is an adult citizen of Alabama residing in St. Clair County, Alabama.

6.

Defendant The National Better Living Association (hereafter "NBLA") is a Georgia non-profit corporation which markets itself as a "membership association that seeks to improve the member's quality of life through wellness services, including group benefits." NBLA regularly and systematically transacts business in the State of Alabama. Upon information and belief, NBLA has never had proper appointments from any of the insurance companies whose products NBLA markets and sells.

7.

The United States Life Insurance Company in the City of New York (hereafter "USLIC") is a for-profit insurance corporation incorporated in New York and doing business in the State of Alabama.  USLIC is an AIG subsidiary that wrote and delivered a group master limited medical benefit insurance policy to NBLA as the policyholder, Policy No G610-242, discussed more herein.

8.

National Healthcare Advisors is a Texas corporation and operated as one of the telemarketing agents for NBLA and USLIC for purposes of marketing, soliciting, and selling the bogus insurance described herein.  Upon information and belief, National Healthcare Advisors regularly and continuously transacts business in the State of Alabama through its targeted marketing and soliciting efforts.

9.

Defendant Albert Cormier Solutions, LLC is a Tennessee limited liability company and operated as one of the telemarketing agents for NBLA and USLIC for purposes of marketing, soliciting, and selling the bogus insurance described herein.  Upon information and belief, Albert Cormier Solutions, LLC regularly and continuously transacts business in the State of Alabama through its targeted marketing and soliciting efforts.

10.

National Healthcare Advisors and Albert Cormier Solutions, LLC may be collectively referred to at times herein as the "Telemarketing Defendants."

11.

As described more fully herein, these Defendants acted in conspiracy and conjunction with one another, as part of a RICO Enterprise, to perpetrate the insurance scheme and pattern of related racketeering activity described herein.

12.

Venue is proper in this district and division in that the Plaintiff resides in this division, the Defendants regularly and continuously transact business in this division, and a substantial part of the acts and/or omissions giving rise to this action occurred in this division.

13.

Jurisdiction is proper in this Court under 28 U.S.C. §1331 in that Plaintiff asserts federal causes of action. Furthermore, Plaintiff's action comes within the purview of the Class Action Fairness Act of 2005.

### III.  FACTUAL BACKGROUND

**A.  The Defendants involved in the scheme and conspiracy who form the RICO Enterprise.**

7

(1)    <u>The National Better Living Association (NBLA)</u>

14.

The scheme and conspiracy described herein was, upon information and belief, designed by NBLA through its individual officers/principals. NBLA also utilized its affiliated entities as authorized agents in perpetrating the scheme, including for-profit affiliated entities established by NBLA's officers and principals, Allied Health Benefits, Inc. and CorpSavers Healthcare, Inc.

15.

NBLA entered into a master group contract with USLIC, an AIG subsidiary, for purported "health" policies that provide poor coverage and extremely limited benefits. NBLA further entered into an agreement with USLIC which allowed NBLA, both directly and through NBLA's authorized agents/affiliates, to solicit, market, and sell USLIC's limited coverage. NBLA and USLIC agreed and conspired to market and sell the coverage through illegal and fraudulent means as described in this action.

16.

NBLA, both directly and through its authorized agents/affiliates, deceptively marketed the coverage underwritten by USLIC as real, comprehensive medical coverage. NBLA directly engaged in this deceptive advertising through its website,

as well as through television and print media. Additionally, sales of the USLIC coverage through NBLA's website were made by NBLA, even though NBLA was not licensed to sell insurance, nor had USLIC appointed NBLA as one of its insurance producers.

17.

NBLA, directly and/or through its authorized agents/affiliates, entered into agreements with telemarketing "call centers," including the Telemarketing Defendants named herein, to market and sell USLIC's coverage through direct solicitation and through telephone sales. NBLA and USLIC entered into an improper agreement and conspiracy with these Telemarketing Defendants to aggressively market and sell USLIC's coverage through the deceptive and illegal means described herein, including misrepresentations about the coverage providing comprehensive individual health insurance, and the rampant and widespread use of unlicensed individuals to sell the insurance. These Telemarketing Defendants and their employees were acting as agents of NBLA and USLIC when marketing and selling the subject coverage in the manner described in this action. Upon information and belief, NBLA and USLIC knew of, agreed to, and intended for the subject coverage to be marketed and sold in the deceptive and illegal manner described in this action.

18.

As described more fully herein, NBLA further perpetrated the deceptive scheme by mailing to consumers purchasing the USLIC coverage materials pertaining to the purported health insurance coverage, including "insurance cards," which further fostered the fraud and did nothing to negate the understanding created by the deception that the coverage provided real, individual health insurance. Further, NBLA collected the monthly fees paid by consumers victimized by this scheme, retained a portion of those monthly fees, and distributed the remainder among the other Defendants in accordance with their agreed upon scheme, conspiracy, and Enterprise.

(2)    The United States Life Insurance Company in the City of New York (USLIC)

19.

As alleged herein, USLIC entered into an agreement with NBLA (and/or NBLA's authorized agent/affiliate) which authorized NBLA and its agents to market, solicit, and sell the coverage underwritten by USLIC. Upon information and belief, USLIC had knowledge, involvement, and a degree of control over the means and methods employed by NBLA and its agents in promoting and selling USLIC's coverage. As alleged herein, NBLA utilized deceptive means in television, print, and

internet advertising to market USLIC's coverage, which USLIC knew of, approved, and agreed to. USLIC further knew of, authorized, acquiesced in, agreed to, and even encouraged the use of unlicensed telemarketers to sell USLIC's coverage through widespread, deceptive representations designed to lead consumers into believing that the USLIC coverage being offered was real, comprehensive individual health insurance. USLIC knowingly and intentionally allowed unlicensed producers to market and sell its coverage, and is liable for the widespread misrepresentations made by NBLA and its agents, including the Telemarketing Defendants named herein and their employees. USLIC received a substantial portion of the monthly fees paid to NBLA by consumers who were victimized by this scheme.

20.

(3)    <u>National Health Advisors and Albert Cormier Solutions, LLC</u>

National Health Advisors and Albert Cormier Solutions, LLC are the entities that were the telemarketing "call centers" or solicitors on behalf of NBLA and USLIC. These Telemarketing Defendants, including their employees and agents, were engaged in the solicitation and sell of insurance for USLIC and NBLA while unappointed and unlicensed to sell insurance. Upon information and belief, these Telemarketing Defendants were the call centers utilized by NBLA and USLIC during the time period in question in this action. NBLA (and/or its authorized

11

agent/affiliate) entered into agreements with each of these Telemarketing Defendants which allowed them to market, offer, and sell the subject USLIC coverage. These Telemarketing Defendants, through their hired employees and agents, engaged in a widespread pattern and practice of intentionally making deceptive misrepresentations about the subject coverage in order to secure sales on behalf of NBLA and USLIC. Upon information and belief, these Telemarketing Defendants received substantial commissions from each sale made on behalf of NBLA and USLIC. These Telemarketing Defendants, including their employees and agents, were acting on behalf of, and as agents for, USLIC and NBLA, who were aware of and authorized the use of unlicensed producers and deceptive tactics to perpetrate sales.[3]

**B. How the Scheme and Conspiracy Were Perpetrated.**

21.

The significant problems consumers have experienced in recent years with "association plan" health insurance are well documented. *See, e.g.,* "Association

---

[3]In addition to the Defendants named in this action, there are other persons and entities who were involved in the scheme and conspiracy, including officers, directors, and principals of NBLA; companies and entities closely affiliated with NBLA and who share common officers and locations with NBLA including, but not limited to, Allied Health Benefits, Inc. and CorpSavers Healthcare, Inc. (upon information and belief, at times these affiliated entities acted as authorized agents on behalf of NBLA); and, principals and employees of the Telemarketing Defendants, whose identities are not currently known by Plaintiff, but who knowingly and intentionally engaged in the illegal conduct and deceptive practices described herein, and did so as representatives and agents of NBLA and USLIC.

Health Insurance: Is It Time to Regulate This Product?" Kofman, M. and Lucia K., M. NAIC's *Journal of Insurance Regulation,* Fall 2005 Vol. 24, No. 1. Such associations must be organized for a specific purpose *other* than to sell health insurance. When coverage is sold through national associations, almost no consumer protections apply.

<div align="center">22.</div>

NBLA purports to be one such association. Set up as a non-profit with loose membership criteria, NBLA's true (and improper) purpose is to solicit, market, and sell purported health insurance nationally to the insurance buying public. The purported health insurance sold by NBLA and its agents is purposefully bundled with other purported "benefits," such as travel discounts or pre-paid legal services, to obfuscate the association's *actual* purpose of soliciting and selling purported health insurance under the auspices of a "group association" or "group benefit," thus fostering a belief in consumers that the association coverage is "group" coverage with benefits and protections similar to job-based group insurance.

<div align="center">23.</div>

NBLA, including its officers and principals, devised a scheme to target consumers who do not qualify for (perhaps due to pre-existing conditions) or otherwise do not have individual health coverage for customary health

<div align="center">13</div>

benefits/services such as doctors visits, hospitalization, prescription medication coverage, etc. As part of its scheme and plan, NBLA would partner with a licensed insurance carrier who would underwrite a purported "health" policy for NBLA and its association members.    With the carrier's knowledge, authorization and involvement, NBLA would then, directly and through its authorized agents/affiliates, market, solicit, and sell the coverage nationally to targeted consumers as though the insurance provided real, comprehensive individual health coverage. Profits from buying consumers in the form of up front and monthly fees would be divided among the entities participating in the scheme, with the largest portion going to the carrier and NBLA.

24.

NBLA's targeted consumers were not previous members of the association, but instead automatically became members of the association when they purchased the junk insurance at issue herein.

25.

NBLA entered into a master group contract with USLIC to underwrite certain "health" policies that provide poor coverage and extremely limited benefits. This group master policy between NBLA and USLIC, Policy No. G610-242, was effective December 1, 2006 and, upon information and belief, expired on November 30, 2009.

14

Further, USLIC entered into an agreement with NBLA (or NBLA's authorized agent/affiliate) whereby NBLA and NBLA's authorized agents/affiliates would market, solicit, and sell USLIC's coverage to consumers across the United States. Upon information and belief, USLIC had involvement and a degree of control over the means and methods by which USLIC's coverage would be marketed and sold by NBLA and NBLA's agents/affiliates. USLIC knew of, acquiesced in, and agreed to the deceptive and illegal tactics described herein that would be and were used to sell its coverage, including deceptive advertising in television, print, and internet by NBLA and its authorized agents/affiliates, the systematic and widespread fraud utilized by telemarketers employed to sell USLIC's coverage, and the use of unlicensed producers to market and sell USLIC's coverage. Indeed, following the Montana Insurance Commissioner's investigation, she found that "USLIC authorized or encouraged the practice of using unlicensed producers ... USLIC appears to have sanctioned the use of unlicensed solicitors in its agent marketing agreement with Timothy Siewert [of NBLA], and knew or should have known of solicitor misrepresentation, such as to indicate a general business practice." (Exhibit A.)

26.

NBLA and USLIC conspired and agreed to allow NBLA, directly and through NBLA's authorized agents/ affiliates, to market, solicit, and sell USLIC's sham

coverage, including the use of deceptive and misleading tactics in television, print, and internet advertising. These marketing tactics were designed and intended to lead consumers to believe that the insurance being offered by NBLA was real, individual health insurance that covers (in full or up to a majority percentage amount) essential and customary health benefits that are commonly associated with healthcare coverage. Advertisements by NBLA on the internet and in print made the same or similar representations, promising to, among other things, "pay benefits like a major medical insurance plan." These representations are false in that the insurance is bogus and pays no benefits.

27.

Additionally, with USLIC's full knowledge and consent, NBLA, directly and/or through its authorized agent/affiliate, employed and entered into agreements with certain telemarketer "call centers" to market, solicit and sell USLIC's coverage. These call centers include National Health Advisors and Albert Cormier Solutions, LLC. These Telemarketing Defendants, through their principals and employees, conspired and agreed to facilitate and participate in NBLA's and USLIC's intended scheme to use deceptive and illegal tactics in order to sell as many USLIC coverages as possible to vulnerable consumers. These Telemarketing Defendants would solicit consumers directly via fake "get-a-quote" websites utilized by NBLA and/or its

16

authorized affiliate, or take in-coming consumer calls in response to advertising by NBLA or NBLA's authorized agent/affiliate.

28.

These Telemarketing Defendants, with NBLA's and USLIC's knowledge and consent, utilized aggressive and deceptive "tell them anything" marketing techniques and representations to sell what the consumer is led to believe is real, comprehensive individual health insurance. These Telemarketing Defendants, acting as agents for NBLA and USLIC, will aggressively say whatever it takes to make the sale, including representations that are false, misleading or incomplete.

29.

These Telemarketing Defendants, with NBLA and USLIC's knowledge and consent, engaged in widespread, intentionally-misleading marketing which, among other things, misrepresented the USLIC coverage as real, comprehensive individual health plans, when in truth the policies were extremely limited and, as characterized by the former Insurance Commissioner of Maine in the Dateline NBC segment: "in reality, almost worthless ... people are essentially being sold an empty promise." As evidenced by the voluminous complaints and recollections of victimized consumers documented in the regulatory actions in Georgia and Montana, in other civil litigation, in Better Business Bureau complaints, and in the Dateline NBC segment,

17

these deceptive and misleading representations were widespread, systematic and consistent.  They included:

> (1) representations that what was being offered and provided was real, traditional health insurance that covers (in full or up to a majority percentage amount) essential and customary health benefits, such as treatment by primary care physicians, doctors visits, hospitalization, emergency room visits, surgery, prescription medication coverage, lab work, and other similar customary benefits/coverages that are commonly associated with healthcare coverage, with the insured expectation that co-pays and/or deductibles are required of the insured;

> (2) representations that the coverage provided coverage for, and regardless of, any pre-existing conditions;

> (3) leading consumers to believe that the NBLA, including the NBLA authorized agent on the telephone line was, in fact, the insurance company, and that what was being sold was an insurance policy, not a membership into an association (as there is no mention of an association membership).

<div align="center">30.</div>

These widespread and consistent telephone representations were false and were utilized to induce as many consumers as possible to purchase the USLIC coverage.

<div align="center">31.</div>

These tactics and misrepresentations were not isolated or the product of one or more "rogue agents."  These telemarketers were trained, encouraged, and required by

<div align="center">18</div>

their superiors to sell the USLIC coverage in this deceptive fashion. Indeed, in the Dateline NBC segment, an undercover investigator posing as a trainee is instructed by her principal at Health Lead Systems, Inc. that "we don't want to be too much of an educator ... I mean, sometimes when you're selling, less is more."

<p style="text-align:center">32.</p>

This systematic use of deceptive tactics and misrepresentations by the Telemarketing Defendants utilized by NBLA and USLIC was known, approved, agreed to by NBLA and USLIC. These aggressive solicitors (who were not licensed to sell insurance) and their deceptive tactics were an integral component of the scheme and conspiracy intended by USLIC and NBLA. These Telemarketing Defendants and their employees and principals were acting as agents of NBLA and USLIC when soliciting and making these insurance sales in the illegal and deceptive manner described in this action.

<p style="text-align:center">33.</p>

These Telemarketing Defendants (and their employees) that were utilized by NBLA and USLIC to fraudulently market and sell USLIC's coverage were soliciting, marketing, and selling the USLIC insurance despite the fact that the Telemarketing Defendants and their solicitor/employees did not have required licenses or appointments to sell the insurance. Stated otherwise, NBLA and USLIC allowed,

<p style="text-align:center">19</p>

knew about, agreed to, and encouraged the use of unlicensed producers to market and sell the subject coverage. The regulatory actions in Montana and Georgia, as well as the Dateline NBC undercover film, demonstrate that the limited insurance  was systematically marketed and sold by individuals who were not licensed to sell insurance. Indeed, in the Dateline NBC segment, Health Lead Systems, Inc.'s top selling solicitor, who is not a licensed insurance producer, is filmed making insurance sales and telling NBC's undercover trainee that "you don't have to know anything about insurance to do this," and further labeling her process of closing the insurance sale as "talking them into submission."

<div align="center">34.</div>

Once a consumer is induced to purchase the insurance by virtue of this deceptive conduct, the consumer's personal banking information is taken so that undisclosed "membership fees" and insurance premiums can be directly obtained from the consumer via debit or credit card, effective immediately, with monthly debits thereafter. The materials subsequently mailed to the consumer by NBLA and USLIC, including deceptive "insurance cards," only further foster the deception and do nothing to negate the representation and consumer understanding that what is being provided is real, comprehensive health coverage. As stated by the former Insurance Commissioner of Maine in the Dateline NBC segment: "you really have to have a

<div align="center">20</div>

PhD in insurance to understand the fine print of these policies."

<div align="center">35.</div>

This deceptive scheme employed by the Defendants results in consumers, like Plaintiff, paying out of pocket money, typically around $200 a month, for useless coverage, usually at a time when they need legitimate, meaningful health insurance the most.    Further, often times these improper practices leave consumers with substantial medical debt.

<div align="center">

**C. The Duration of the Scheme and Conspiracy.**

36.

</div>

Upon information and belief, this scheme and conspiracy has been perpetrated and ongoing since at least December 2006, has continued through at least late 2012, (as evidenced by the Georgia regulatory action), and is still ongoing today.   As previously alleged, USLIC provided the subject coverage per its Master Policy effective December 1, 2006 and expiring on November 30, 2009.   Even beyond November 30, 2009, USLIC continued in the perpetration of the scheme by routinely denying insurance claims that had been submitted by victims believing they had bona fide health insurance.   For instance, as described more herein, USLIC continued to communicate with Plaintiff regarding the status of her claims until at least March 2010. The USLIC Master Policy required USLIC to remain involved with submitted

<div align="center">21</div>

claims until at least through the end of February 2011.

<div align="center">37.</div>

The regulatory action by the Georgia Insurance Commissioner evidences that this scheme and the improper practices remained rampant and widespread through at least late 2012. Upon information and belief, the scheme is still ongoing.

**D.** **The Scheme Was Widespread, Systematic and Part of a Related Pattern.**

<div align="center">38.</div>

As stated, the conduct and practices described herein, which were played upon the named Plaintiff (*see* section E of this Complaint), were not random or isolated events. Rather, they were part of an intentional and well designed pattern and scheme orchestrated by the Defendants in conspiracy and in agreement with one another. The widespread and systematic nature of the scheme, pattern, and conspiracy is evidenced by, among other things: the investigation of these practices by Insurance Commissioners in Montana and Georgia; the investigation and undercover reporting by Dateline NBC; other civil cases filed by victimized consumers; and countless complaints made by victimized consumers to Better Business Bureaus, consumer watchdog websites, and insurance departments across the United States. This evidence shows that the manner in which the scheme operated was not only widespread, but was the regular way the Defendants did business. Some of that

<div align="center">22</div>

evidence will be discussed below:

   **(i)    The regulatory action by the Montana Insurance Commissioner and the civil litigation by Montana victims.**

39.

Following an investigation, in June 2011 the Montana Insurance Commissioner brought a disciplinary action against all of the Defendants named in this matter, as well as other participants and beneficiaries of the improper insurance scheme. As alleged by the Montana Insurance Commissioner, all of these Defendants "are or were affiliated persons or entities who, in concert, transacted and distributed insurance or health related products in the State of Montana to 161 Montana insurance consumers since 2006 in a manner violative of Montana's insurance code." (Exhibit A.)

40.

Further, according to the Montana Insurance Commissioner, NBLA's "membership" consists of "insurance consumers who are seeking and who believe they are buying comprehensive health or major medical insurance instead of supplemental-type policies and limited medical benefits." The Montana Insurance Commissioner's action then goes on to address the Defendants' transactions and dealings with at least six (6) Montana consumers, including Carol Croteau, Renee Jones, and Keith Moore. (Exhibit A, ¶¶29-34.) Like the Plaintiff in this action, all

of these consumers were subjected to, and induced by, deceptive representations made by unlicensed solicitors acting on NBLA's and USLIC's behalf, including consistent representations that the subject coverage provided real, comprehensive health coverage, including coverage for any pre-existing conditions. According to the Montana Insurance Commissioner, the Defendants falsely represented that "the NBLA products provided health insurance coverage or other benefits within the reasonable expectations of Montana insurance consumers." The Montana victims "told investigators that telemarketers promised that the insurance would provide full coverage for all pre-existing conditions." (Exhibit A.)

<div align="center">41.</div>

The Montana Insurance Commissioner's action resulted in substantial fines and the cessation of these practices in Montana. In her press release announcing the settlement, Montana Insurance Commissioner Monica Lindeen stated: "Association scams are one of the worse insurance scams operating today. By leading people to believe that they had the full coverage of major medical health insurance, these scams damaged not only their victim's wallets, but their health." (Exhibit A.)

<div align="center">42.</div>

Some of the victims referenced in the Montana Insurance Commissioner's action subsequently brought civil litigation against the Defendants and others,

<div align="center">24</div>

asserting, among other claims, RICO violations for a pattern of mail and wire fraud, which survived a motion to dismiss brought by the Defendants in this action. *Renee Jones, et al. v. The National Better Living Association, Inc.; The United States Life Insurance Company in the City of New York, et al.,* United States District Court for the Northern District of Montana (Missoula Division), Case No.: CV-12-200-M-DWM. A copy of the First Amended Complaint from that action is attached hereto as Exhibit B.

43.

For example, related predicate acts of mail and wire fraud were perpetrated by Defendants on Montana victim Renee Jones, whose transaction, and the fraudulent predicate acts played on her by Defendants, are described in her First Amended Complaint attached hereto as Exhibit B at ¶¶15-26. The federal court overseeing her civil action ruled that she had pled her RICO claim sufficient to meet the heightened pleading standard of Fed.R.Civ.P. 9(b). (Doc. No. 83 in *Renee Jones, et al. v. The National Better Living Association, Inc., et al.,* United States District Court for the Northern District of Montana (Missoula Division), Case No.: CV-12-200-M-DWM.) The claims and allegations related to the RICO claim of Renee Moore as set forth in her First Amended Complaint (attached hereto as Exhibit B) are incorporated herein by reference to demonstrate related predicate acts that form a pattern by Defendants

of perpetrating their scheme to defraud.

44.

Renee Jones began searching online for affordable health insurance for herself in July 2009. She entered her personal information on a website to obtain a quote for health insurance coverage. In response to this online inquiry, Renee Jones was contacted by telephone in early July 2009 by a female solicitor. This female solicitor represented to Renee Jones that she was with NBLA. The female solicitor's name was Veronica Bables. This female solicitor, Veronica Bables, was employed with National Healthcare Advisors, and was acting as an agent/representative for NBLA and USLIC in communicating with Renee Jones.

45.

During this telephone call, Renee Jones made several inquiries regarding the health coverage being marketed and offered to her. Renee Jones asked the solicitor if the coverage would cover doctors visits, emergency room visits, and provide prescription medication coverage. The solicitor answered in the affirmative. Renee Jones also asked whether the insurance provided coverages for services at her specific hospital in Montana and with her specific doctors that she identified. She also asked if the health insurance would provide coverage for pregnancy if she got pregnant. The solicitor on the call answered in the affirmative to these inquiries. These

representations by the solicitor were false.

<p style="text-align:center">46.</p>

Renee Jones was further told by the solicitor that NBLA's insurance would cover 70% of her medical costs, and that she would be responsible for the balance. The solicitor represented to Renee Jones that the insurance provided the type of medical coverage that "so many people really needed." Renee Jones relied to her detriment on these representations, which were false.

<p style="text-align:center">47.</p>

Renee Jones also inquired about expected co-pays, deductibles, and other out-of-pocket expenses. In response to her inquiries, the solicitor stated that there was a $50 deductible for prescriptions, and after the first payment of this $50 deductible, generic prescriptions would cost $12 and brand name prescriptions would cost $24; that there would be a $100 deductible for ER visits, and after payment of that first $100 deductible, 100% of Renee Jones's ER visits would be covered; and that there was no deductible on regular office doctor visits. These representations by the solicitor were false.

<p style="text-align:center">48.</p>

These representations made by the solicitor by phone to Renee Jones were false. Renee Jones relied to her detriment on these representations in moving forward

<p style="text-align:center">27</p>

with purchasing the USLIC coverage/NBLA membership. Renee Jones paid NBLA $239 to start the membership/coverage, and continued to pay $139 per month.

<div align="center">49.</div>

None of Renee Jones's claims under the USLIC coverage were paid, as they were all denied. The policy did not cover any of her health insurance costs.

<div align="center">50.</div>

Renee Jones cancelled on December 21, 2009 because she could not afford a policy that did not cover any health insurance costs. As a result of the Defendants' conduct, Renee Jones paid premium monies for non-existent coverage, and incurred over $15,000 in medical expenses for prenatal care and giving birth to her daughter. She was directly injured by the Defendants' scheme to defraud.

<div align="center">51.</div>

The representations from the solicitor described above misled Renee Jones into believing that she had coverages in accord with the responses to her inquiries, and that the coverage constituted real, meaningful, individual health insurance that provided coverage for essential and customary health benefits, such as doctors visits, ER visits, prescription medication coverage, lab work, etc., with the expectation that she would be responsible for co-pays and deductibles in accordance with what was represented to her. The misrepresentations made by the solicitor also misled Renee

<div align="center">28</div>

Jones into believing that she had real, meaningful individual health insurance as opposed to a sham and bogus product that did not and would not pay for any claims or services. The Defendants obtained money from Renee Jones in the form of membership dues/premium payments, which were distributed among the Defendants as described herein.

<div align="center">52.</div>

These misrepresentations made to Renee Jones regarding the extent/scope of the USLIC insurance product are consistent with, and reflective of, the systematic "tell them anything" practices and misrepresentations employed by Defendants as an integral and related component of their scheme to defraud and to sell as many USLIC policies as possible.

<div align="center">53.</div>

As with Plaintiff, the Defendants also utilized the U.S. Mails in furtherance of their scheme to defraud with respect to Renee Jones, as the mails were used in denying her claims and in sending her materials regarding the coverage, including her insurance card. Just as it was for Plaintiff, Defendants' use of the U.S. Mails allowed Defendants to further and carry out their scheme to defraud.

<div align="center">29</div>

(ii)    **The Dateline NBC investigative segment.**

54.

On March 26, 2012, the television program Dateline NBC broadcast an investigative segment focusing on this specific insurance scheme.  The segment not only provides an in-depth analysis of how the scheme was perpetrated, but it also provides a visual glimpse into the internal operations and deceptive practices of the hired telemarketing agents, including Health Lead Systems.  As part of its investigative piece, Dateline NBC equipped its staffers with hidden cameras to seek, and ultimately obtain, a telemarketing sales position with Health Lead Systems.

55.

The Dateline NBC investigative segment which was broadcast on March 26, 2012 can be viewed on www.nbcnews.com/video/dateline/46860128/#46860128.

56.

In the Dateline NBC investigative segment, these telemarketing agents can be seen and heard informing consumers, via telephone, that they were completely covered, regardless of any pre-existing conditions, and that the coverage was real, comprehensive medical coverage.  In one portion of the segment, an undercover Dateline NBC staffer calls Health Lead Systems disguised as a potential consumer. This undercover consumer makes it clear to the telemarketing agent that he wants

comprehensive individual health insurance. The telemarketer describes the coverage that the consumer will be getting as something that will cover him if anything catastrophic were to happen. The former Maine Insurance Commissioner who views these representations by videotape states on record that what is being told to consumers is clearly deceptive. She states that based on what the solicitor is saying, "the consumer is of the mindset that this is comprehensive medical coverage."

<div align="center">57.</div>

The Dateline NBC segment also shows through visible evidence that these deceptive practices are not random or isolated. Rather, telemarketing solicitors are trained and encouraged to deceptively market and sell the subject insurance in this fashion. In one training session filmed undercover, the trainee's supervisor states "we don't want to be too much of an educator...I mean, sometimes when you are selling, less is more." Speaking to the undercover NBC staffer on hidden camera, Health Lead System's top salesperson states "you don't have to know anything about insurance to do this," and characterizes her process of closing insurance sales as "talking them into submission."

<div align="center">58.</div>

In the Dateline NBC segment, New York Superintendent of Financial Services Ben Lawsky states that it is not just NBLA and the call centers that are to be held

accountable - - - ultimately, according to Ben Lawsky, it comes down to the underwriter who writes the insurance plan.  Lawsky states: "the insurance company has a corporate responsibility - - - they are ultimately on the hook for all of this. People are being deceived about these products."

### (iii)    The investigation and regulatory action by the Georgia Insurance Commissioner.

59.

Also in 2012, the Georgia Insurance Commissioner conducted an investigation into the practices, transactions, and course of business engaged in by NBLA, its officers, affiliates, hired call centers, and its underwriting insurance carriers. (Exhibit C to this Complaint.)

60.

Consistent with the misrepresentations made to Plaintiff, to the Montana consumers identified in the Montana action, and to other consumers across the country, the regulatory action by the Georgia Insurance Commissioner describes how targeted consumers were deceptively told that the coverage offered constituted real, comprehensive individual health insurance as opposed to sham coverage with very limited benefits.  As the Georgia Insurance Commissioner alleged: "as part of the telephone solicitation, individuals soliciting on behalf of NBLA refer to the coverage

32

sold under NBLA's 'expanded memberships' as something other than a limited medical benefits policy, such as a 'high risk plan that covers all major things,' thereby confusing consumers and misrepresenting the type of policy under which a prospective member will receive coverage." (*See* Exhibit C, ¶165.)

61.

To further demonstrate the related pattern of the insurance scheme, the Georgia Insurance Commissioner's regulatory action describes the misrepresentations made to the Montana consumers addressed in the Montana regulatory action. (Exhibit C, ¶¶167-169.)    The Georgia Insurance Commissioner then describes the misrepresentations made in transactions involving several consumers, including the deceptive misrepresentations made by NBLA's telemarketers to the following Georgia consumers: Linda Yancey, Cynthia Sims, Nancy Brand, Glenda Neese, Janet Keeler, Dianja McMillan, Donna McLain, John Grecco; to the following Virginia consumers: Ronald Woods, Brenda Cosner; to consumer Wesley Hoy of Florida; and consumer Barbara Stemmler of Pennsylvania. (Exhibit C, ¶¶170-181.) Consistent with the telephone misrepresentations made to Plaintiff and to the consumers described in the Montana regulatory action, these telemarketers, including the Telemarketing Defendants, made misrepresentations on behalf of NBLA and the insurance carrier consisting of, but not limited to: (1) representations that what was

33

being offered and provided was real, traditional health insurance that covers (in full or up to a majority percentage amount) essential and customary health benefits, such as treatment by primary care physicians, doctors visits, hospitalization, emergency room visits, surgery, prescription medication coverage, lab work, and other similar customary benefits/coverages that are commonly associated with healthcare coverage, with the insured expectation that co-pays and/or deductibles are required of the insured; (2) representations that the coverage provided coverage for, and regardless of, any pre-existing conditions; (3) leading consumers to believe that the NBLA, including the NBLA authorized agent on the telephone line was, in fact, the insurance company, and that what was being sold was an insurance policy, not a membership into an association (as there is no mention of an association membership); (4) that the insurance coverage being offered was comparable to a "80/20" health insurance plan, when in truth the benefits were far more limited than a traditional "80/20" plan. (Exhibit C, ¶¶170-181.)

<p style="text-align:center">62.</p>

These representations made to the consumers described in the Georgia regulatory action, which caused these consumers to act to their detriment, are consistent with the misrepresentations made to Plaintiff, to the Montana consumers, and to other consumers across the country. The misrepresentations were an integral

<p style="text-align:center">34</p>

part of a pattern, general business practice, and related series of transactions by related entities against targeted consumers.

63.

While not describing the details of the transactions or misrepresentations, the Georgia regulatory action goes on to identify no less than 385 additional Georgia consumers by name and zip code who were sold insurance coverage as a result of the scheme to demonstrate that insurance was consistently, and as part of a pattern and practice, sold by unlicensed and unappointed producers.

64.

Upon information and belief, the regulatory action by the Georgia Insurance Commissioner resulted in significant fines and settlements.

65.

Complaints from consumers in other civil litigation,[4] from complaints made to Better Business Bureaus, and from the volumes of complaints found on consumer watchdog websites further evidence the related pattern of this scheme over the years. Commenting on complaints made to the Better Business Bureau, the Georgia Insurance Commissioner stated in his regulatory action: "the Better Business Bureau

---

[4] *See*, for example, *David Knisely v. National Better Living Association, Inc., et al.*, United States District Court for the Northern District of West Virginia (Martinsburg Division), Case No.: 3:14-cv-00015-GMG.

currently has approximately 300 complaints regarding NBLA and its affiliates listed in its database from consumers nationwide. A majority of these complaints involve misrepresentations made to consumers during the sale, solicitation, or negotiation of an NBLA 'expanded membership'." (Exhibit C, ¶183.) Further, the Better Business Bureau just for the Metro Atlanta area states the following regarding NBLA: "BBB files indicate that this business has a pattern of complaints, with consumers alleging: ... that they were misled into believing they were purchasing major medical insurance; ...they were misled to believe their prescriptions would be covered ... an example is complaints that allege consumers disclosed pre-existing medical conditions and were assured coverage was available."

### E. Plaintiff's Transaction.

66.

Plaintiff is a 57-year-old citizen residing in St. Clair County who was in need of individual health insurance. In early February 2009, Plaintiff began looking for affordable, individual health insurance coverage. On February 15, 2009, Plaintiff conducted an internet search from her home for such coverage. She viewed a webpage maintained by NBLA purporting to offer and sell real, individual health policies.

67.

The webpage indicated that NBLA was the entity offering and providing the individual health insurance coverage. The webpage purported to offer "real medical benefits," including coverage for essential and customary health benefits such as "doctor's visits, hospitalization, surgical, ICU, and prescription drugs" coverage. The webpage used words and phrases indicating that the available health insurance was comprehensive in scope and provided real, meaningful benefits for health coverage. The website further used words and phrases indicating that coverage would be provided for, and regardless of, pre-existing medical conditions, such as "all medical conditions accepted."

68.

Based on the representations contained on this website, Plaintiff believed that the health insurance marketed and offered by NBLA provided real, meaningful individual health insurance for essential and customary health benefits, such as treatment by primary care physicians, doctors visits, hospitalization, surgery, prescription drug coverage, and other similar benefits commonly associated with health insurance. Plaintiff also believed that what was being offered and advertised would cover her for, and regardless of, pre-existing medical conditions. Plaintiff relied on these representations, and proceeded to complete online information needed

in order to receive a quote.

<div align="center">69.</div>

The representations made on the website, upon which Plaintiff relied, were misleading and untrue. (*See also* FN#2.)

<div align="center">70.</div>

After Plaintiff provided the requested information online, on the afternoon of February 15, 2009 she received a call at her home from a telemarketer agent in response to the online information she provided. This telemarketer was female and stated she was calling from Texas. This telemarketer was, upon information and belief, an employee for one of the Telemarketing Defendants that were utilized by NBLA and USLIC to solicit and sell the USLIC coverage as described herein. The exact identity of this individual telemarketer who transacted with Plaintiff, and the Telemarketing Defendant she was working for, are, upon information, within the records and knowledge of the Defendants and will be obtained in discovery. However, based upon information Plaintiff has been able to obtain to date, Plaintiff believes that the individual telemarketer was most likely an employee of National Healthcare Advisors. Plaintiff bases this on the fact that NBLA's (or NBLA's authorized agent/affiliate) primary telemarketing contract during this time was with National Healthcare Advisors. This telemarketing agent marketed and sold Plaintiff

<div align="center">38</div>

the subject coverage on behalf of NBLA and USLIC.

71.

The telemarketing agent who contacted Plaintiff said nothing about an association, and instead gave the impression that she was with a health insurance company, thereby leading Plaintiff to believe that she was communicating and dealing with a health insurance company.  In this telephone conversation, the telemarketer agent represented that what they could provide was affordable, "full" health insurance with extensive medical benefits.  Plaintiff specifically requested and expressed her desire for comprehensive, individual health insurance that covered (in full or up to a majority percentage amount) customary health benefits such as treatment by primary care physicians, doctors visits, hospitalization, emergency room visits, surgery, prescription medication coverage and other similar customary benefits that are commonly associated with health care coverage. The telemarketing agent represented to Plaintiff that this type of comprehensive, individual health coverage is what would be provided, and that the most comprehensive coverage would come from the "Premiere 1,000" insurance plan.  The telemarketing agent represented to Plaintiff that the coverage from the "Premiere 1,000" would cover doctors visits (with no limit on doctors visits within the carrier's PPO network, and no deductibles for regular office doctor visits), lab work, prescription drugs, hospital stays, ambulance services,

emergency room visits, ICU, and other medical occurrences. She further described the coverage as being an "80/20" insurance plan, whereby the insurance would cover 80% of the medical bills/costs. With respect to co-pays, deductibles, and other out-of-pocket expenses to be incurred by the insured, the telemarketing agent stated that there was a $50 deductible for prescriptions, and after the first payment of this $50 deductible, generic prescriptions would cost $12 and brand name prescriptions would cost $24; that there would be a $100 deductible for emergency room visits, and after payment of that first $100 deductible, 100% of Plaintiff's emergency room visits would be covered; and that there was no deductible on regular office doctor visits. Further, Plaintiff specifically inquired about coverage for existing medical conditions, and the agent represented to Plaintiff that comprehensive health coverage would be provided regardless of past medical history or any pre-existing conditions. The agent represented that although the "Premiere 1,000" insurance plan was more expensive, it provided the most comprehensive medical coverage to Plaintiff.

<div align="center">72.</div>

The representations from the telemarketing agent described above misled Plaintiff into believing that she had coverages in accord with the responses to her inquiries and the representations made by the agent, and that the coverage constituted real, meaningful individual health insurance that provided coverage for essential and

<div align="center">40</div>

customary health benefits, such as treatment by primary care physicians, doctors visits, hospitalization, emergency room visits, prescription drug coverage, and other similar benefits commonly associated with health insurance, with the expectation that Plaintiff would be responsible for co-pays and deductibles in accordance with what was represented to her. The representations made by the telemarketing agent also misled Plaintiff into believing that what was being offered was real, meaningful individual health insurance as opposed to a sham and bogus product that did not and would not pay for any claims or services. The representations by the telemarketing agent also misled Plaintiff into believing that what was being offered and what she purchased would cover her for, and regardless of, pre-existing medical conditions.

73.

These representations made by the telemarketing agent by phone to Plaintiff were false and misleading. Plaintiff relied to her detriment on these representations in moving forward in purchasing the USLIC coverage. Plaintiff believed that the insurance coverage she was purchasing was consistent with the promises and representations made to her by the telemarketing agent, and she therefore relied to her detriment on these representations by moving forward in purchasing the USLIC insurance.

74.

The telemarketing agent did nothing to negate Plaintiff of the notion that she was purchasing real, meaningful individual health insurance and not a bogus product that did not pay claims. The telemarketing agent intentionally suppressed and omitted material facts from Plaintiff to induce the sale, including the fact that the coverage was not as represented to her and was, in fact, a sham product. Despite inquiry by Plaintiff, the telemarketing agent failed to disclose the fact that the subject insurance was extremely limited and would not cover the cost incurred to treat any kind of medical injury or illness.

75.

These facts and representations involving the core terms of coverage were obviously material and important to Plaintiff, causing her to rely to her detriment. These representations, upon which Plaintiff relied, were misleading and untrue.

76.

These misleading representations from the telemarketing agent and website described above induced Plaintiff to purchase the insurance underwritten by USLIC, which Plaintiff believed to be real, comprehensive individual health insurance. She proceeded with the purchase via telephone with this telemarketing agent in the same February 15, 2009 phone call. The telemarketing agent obtained Plaintiff's

banking/debit card information for the first month's payment and subsequent monthly payments, which were over $200 a month.

<div align="center">77.</div>

NBLA and/or its authorized agent/affiliate did, in fact, debit Plaintiff's account each month for the USLIC coverage and undisclosed membership/association fees.

<div align="center">78.</div>

Plaintiff never received a copy of her health insurance policy, but she did receive from NBLA by U.S. Mail what purported to be an "insurance card" from NBLA for the "Premiere 1000" plan and correspondence from NBLA, all of which further fostered Plaintiff's belief that she had real, individual health coverage.

<div align="center">79.</div>

These items further fostered Plaintiff's belief, based on the representations made to her, that what she purchased was real, meaningful individual health insurance that covers (in full or up to a majority percentage) those essential and customary benefits commonly associated with health care coverage, such as treatment by primary care physicians, doctors visits, hospitalization, etc. The front of the card is labeled in bold, large print "Physician & Hospital Benefits," along with symbols and names of healthcare networks. The card further includes an 800 number for "Member Services." The correspondence alluded to "peace of mind" in being covered. All of

<div align="center">43</div>

this further fostered Plaintiff's belief as described above, misled Plaintiff, and did nothing to negate the representations and Plaintiff's understanding that what she had purchased was real, meaningful individual health insurance that covered customary benefits associated with health care coverage, such as doctors visits and hospitalization.  The representations on these materials were false, as the insurance was a sham product that provided illusory, useless benefits and that did not pay for claims or services.  Defendants used the mail in sending these items to further perpetrate and carry out their scheme to defraud.  The insurance card and correspondence were intended to deceitfully further Plaintiff's belief and understanding that she had real individual health coverage, and did, in fact, mislead Plaintiff in that fashion.

80.

While Plaintiff does not recall the specific date that she received the above-referenced correspondence and insurance card, she did receive them some time after the above referenced phone call, and it is logical to assume that she received them within one (1) to three (3) months of the above-referenced purchase/phone call. However, there was nothing about or stated in those materials that would have triggered inquiry notice by Plaintiff of her injury from Defendants' fraudulent scheme.  Plaintiff only read the front of the insurance card, as the back of the

insurance card contained claim/billing instructions directed to providers, not the participant. There were no directives from NBLA on the paper containing the insurance card to read the front of the card or the back of the card containing instructions directed to any third-party provider.

<p style="text-align:center">81.</p>

Further, even if Plaintiff had read the back of the insurance card, it would not have triggered inquiry notice of her injury. Again, the back of the card contains small print billing and claim instructions clearly directed to a provider, including claim and billing protocols that are beyond Plaintiff's knowledge and understanding. Those provider instructions and their terminology are, at best, vague, confusing, ambiguous, and hard to understand to Plaintiff in the context of the back of an insurance card directed to a provider, and would not have triggered inquiry notice by Plaintiff. Those provider instructions direct how providers are to reduce or modify bills, or how they will be repriced, between the provider (who may be contracted in the "PPO") and the insurance carrier.

<p style="text-align:center">82.</p>

Further, as previously alleged, Plaintiff knew that there were some limitations on her insurance and it was not completely unlimited in the literal sense of the word. As alleged, Plaintiff knew and believed her insurance covered 80% of medical bills,

<p style="text-align:center">45</p>

and she knew that certain deductibles and co-pays would be required of her with some services. What Plaintiff did not know, and what Defendants concealed, was that the coverage was not real, meaningful coverage and that it would not cover any of the services, conditions, benefits, or other things that were promised and represented to her by Defendants.

<div align="center">83.</div>

Further, even if Plaintiff had read the back of the insurance card, there is nothing about its contents that directly contradicts all of the several misrepresentations made to Plaintiff. For example, Plaintiff was told that her insurance would provide coverage for pre-existing medical conditions, which was untrue. The back of the insurance card says nothing about this. Moreover, the back of the insurance card says nothing about the fact that none of the services, benefits, coverages, other things promised to Plaintiff would be covered or provided, and that the insurance was bogus and illusory.

<div align="center">84.</div>

On November 23, 2009, Plaintiff called the number on her insurance card to speak with someone about submitting to the carrier medical bills/claims from medical services Plaintiff had received/incurred. Plaintiff ultimately spoke with an individual named David Siewert who, upon information and belief, was employed with NBLA

<div align="center">46</div>

and/or with one of NBLA's authorized agents/affiliates. At the time of this call, however, David Siewert gave Plaintiff the impression he was with the insurance company that she had purchased insurance with. This further fostered Plaintiff's belief that she had real, meaningful individual health insurance. Plaintiff informed David Siewert that she was attempting to submit medical bills/claims for her insurance, and informed him of the types and nature of the medical bills she would be submitting. David Siewert informed Plaintiff those medical bills/claims would be covered under her insurance (which was not true), and gave Plaintiff instructions for submitting those medical bills/claims, which Plaintiff followed.

<div align="center">85.</div>

Plaintiff relied to her detriment on the representations of David Siewert made during this call, as she submitted these claims and continued to pay on the insurance she had purchased. These representations further fostered Plaintiff's belief and understanding regarding the nature and scope of the insurance as had been represented to her at the time of purchase. Further, based on these representations, Plaintiff believed her claims were going to be paid.

<div align="center">86.</div>

During the first week of December 2009, Plaintiff received correspondence by mail from the American General - AIG "Claims Department" acknowledging receipt

<div align="center">47</div>

of Plaintiff's claims and informing her that she did not have to take further action at that time.  Plaintiff believed her claims were being processed.  The correspondence further fostered Plaintiff's belief and understanding that she had legitimate, individual health insurance and not a bogus product that paid for no claims or services.  The letter led Plaintiff to believe that her claims were being processed in accord with real, legitimate health insurance.  The letter was false and known to be false, as the coverage was bogus and did not pay for any claims or services.  Plaintiff relied to her detriment on the letter, as she believed her claims were being processed and she continued paying on the sham insurance.

<div align="center">87.</div>

In mid-December 2009, Plaintiff received correspondence from the American General - AIG "Claims Department" stating that it needed additional time to review Plaintiff's claims and that they were under further review.  Plaintiff believed her claims were being processed.  Plaintiff continued to receive such correspondence from American General - AIG as late as March 3, 2010.  Again, this correspondence further fostered Plaintiff's belief and understanding that she had legitimate, individual health insurance and not a bogus product that paid for no claims or services.  The letters led Plaintiff to believe that her claims were being processed in accord with real, legitimate health insurance.  The letters were false and known to be false, as the

<div align="center">48</div>

coverage was bogus and did not pay for any claims or services. Plaintiff relied to her detriment on the letter, as she believed her claims were being processed and she continued paying on the sham insurance.

<div align="center">88.</div>

These claims submitted by Plaintiff were never paid by USLIC, AIG, or anyone else. Plaintiff never received any benefits.

<div align="center">89.</div>

Plaintiff stopped payment on her USLIC insurance/NBLA membership in or around June 2010. It was at this time that Plaintiff discovered that she had been victimized by Defendants' scheme to defraud and had been injured thereby.

<div align="center">90.</div>

Plaintiff did not know, and had no reason or way to know, that she had been victimized by Defendants' scheme and injured thereby until this time in June 2010. Before that, Plaintiff did not know, and had no reason or way to know, that she had been victimized by Defendants' widespread scheme and injured thereby. As previously alleged, at the time Plaintiff purchased the insurance, several misrepresentations were made to her by Defendants and/or their agents, which Plaintiff relied upon in purchasing and believed to be true. At no time during Plaintiff's call, or any time after, did anyone disclose to Plaintiff the truth surrounding

<div align="center">49</div>

these representations. Instead, Defendants and their agents intentionally suppressed and concealed from Plaintiff the truth surrounding the representations made to her.

91.

As previously alleged, there was nothing about the correspondence and insurance card sent to Plaintiff that negated, or would have negated, the representations made to her at the time of sale, and at no time did anyone disclose to Plaintiff in any fashion, either directly or indirectly, that the representations made to her were false. In fact, as previously alleged, these materials further misled Plaintiff into believing that she had real, meaningful health insurance. There was no reason for Plaintiff to believe otherwise.

92.

Further, Defendants' agents and employees were trained and instructed not to disclose the truth regarding the sham nature of the insurance product sold and the falsity of the representations knowingly made to consumers on a widespread basis. Indeed, Defendants continued to defraud others and conceal the truth regarding the bogus insurance to others on a widespread scale and systematic basis, as the other investigations and transactions referenced herein demonstrate.

93.

Further, NBLA and USLIC, in conjunction and conspiracy with one another, serviced Plaintiff's policy so as to actively conceal the true nature of the product. For instance, NBLA and/or its agents continued to deduct money from Plaintiff's account for the sham product without disclosing the truth regarding the representations made to her and the sham nature of the insurance. Further, NBLA made further affirmative misrepresentations to Plaintiff after the fact of the original fraud from the sale, which operated to further conceal the truth: as previously alleged, NBLA's agent falsely informed Plaintiff that the medical bills/claims she would be submitting would be covered and further lulled Plaintiff into believing that she had the coverage as represented to her and meaningful health insurance. Similarly, as previously alleged, American General - AIG sent Plaintiff correspondence indicating that her claims were being processed and reviewed, which was false. These representations further lulled Plaintiff into believing that she had real, meaningful health insurance coverage as represented to her. NBLA and USLIC serviced Plaintiff's policy so as to actively conceal the true bogus nature of the product and the falsity of the representations that had been made to her.

94.

Defendants affirmatively and purposefully concealed from Plaintiff the true

sham nature of the insurance product and the falsity of the representations made to Plaintiff. Defendants had a duty to inform Plaintiff of the truth regarding the representations made, which Defendants knew were false and misleading. One who speaks when questioned has a duty not to provide non-truths or half-truths; at no time did anyone correct or disclose the non-truths/misrepresentations made to Plaintiff, which were known by Defendants to have been made. Defendants had a duty not to suppress and conceal the truth regarding the sham product and the falsity of the representations made to Plaintiff.

<div align="center">95.</div>

Plaintiff did not, could not, and had no way to discover the Defendants' scheme to defraud and her injury therefrom until this time in June 2010. Because Defendants suppressed and concealed the truth surrounding the sham nature of the insurance and the misrepresentations made about it, Plaintiff did not and could not discover Defendants' scheme and her injury through reasonable and diligent inquiry until June 2010. Plaintiff reasonably relied on Defendants' affirmative and/or active concealment to her detriment by continuing to pay for the bogus insurance.

<div align="center">96.</div>

Consequently, the statute of limitations applicable to any claims asserted by Plaintiff as a result of the scheme to defraud described herein has been tolled as a

result of the Defendants' concealment.   Plaintiff did not and could not have discovered the scheme to defraud and her injury therefrom until the time alleged herein, thereby tolling the applicable statute of limitations.

<div align="center">97.</div>

As a result and proximate cause of this scheme, Plaintiff incurred expenses and damages in the form of monthly payments to NBLA for illusory coverage and illegal "membership" dues, along with other economic and non-economic damages.   The payments were deducted monthly from Plaintiff's bank by NBLA and/or its authorized agent/affiliate for what had been represented as, and what Plaintiff believed, was comprehensive medical coverage.   Upon information and belief, the proceeds from Plaintiff's monthly payments were distributed among the Defendants in accord with their scheme and Enterprise, with the largest monthly portion going to USLIC.   Specifically, the group policy USLIC issued to NBLA called for the premiums to be paid by NBLA to be based upon the number of insureds NBLA had.

<div align="center">98.</div>

As a proximate cause and result of this scheme, Plaintiff also incurred damages in the form of unpaid medical bills/claims and medical debt.

<div align="center">99.</div>

Upon information and belief, thousands of other consumers across the United

States were also victimized and damaged by the Defendants in this same manner as Plaintiff.

## IV. CLASS ACTION ALLEGATIONS

### 100.

Plaintiff brings this action pursuant to Federal Rules of Civil procedure 23(a) and 23(b)(1), (b)(2) and (b)(3) on behalf of herself and a nationwide Class consisting of:

> All consumers in the United States who paid money for coverage under the NBLA/USLIC Group Master Contract, Group Policy No. G-610, 242.

### 101.

The Class excludes Defendants and any entity in which any defendant has a controlling interest, and their officers, directors, legal representatives, successors and assigns.

### 102.

The Class is so numerous that joinder of all members is impracticable.

### 103.

A Class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

104.

Plaintiff's claims are typical of the claims of the Class.

105.

There are questions of law and fact common to the Class, including but not limited to:

a.    Whether the Defendants engaged in an improper scheme to solicit, market and sell worthless, junk insurance;

b.    Whether the Defendants profited from the improper conduct challenged herein;

c.    Whether the Defendants' "association" insurance scheme constituted a pattern of racketeering activity;

d.    Whether the Defendants are liable to Plaintiff and the class for damages and, if so, the measure of such damages.

106.

These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.

107.

Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has no claims antagonistic to those of the Class.

Plaintiff has retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation. Plaintiff's counsel will fairly, adequately and vigorously protect the interests of the Class.

108.

Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

109.

Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

110.

Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby

making appropriate final injunctive relief or corresponding declaratory relief with

respect to the Class as a whole.

<div align="center">111.</div>

Class action status is also warranted under Rule 23(b)(3) because questions of

law or fact common tot he members of the Class predominate over any questions

affecting only individual members, and a class action is superior to other available

methods for the fair and efficient adjudication of this controversy.

<div align="center">

**COUNT I**
**Violations of the Racketeer Influenced and Corrupt Organizations Act,**
**18 U.S.C. §§1962(c)**
**(Against All Defendants)**

</div>

<div align="center">112.</div>

Plaintiff adopts and incorporates ¶¶1 - 111 of this Complaint as if set out fully

in this Count.

<div align="center">113.</div>

Plaintiff, each class member, and each named Defendant are "persons," as that

term is defined in 18 U.S.C. §§1961(3) and 1962(c).

<div align="center">114.</div>

The RICO Enterprise is an association-in-fact consisting of the Defendants

named in this action.  The relationship between these entities was created, in part by,

<div align="center">57</div>

among other things, the insurance policy underwritten by USLIC and issued to NBLA, the separate agreement between USLIC and NBLA for NBLA to market the policy to individuals, and the agreement with NBLA (and/or NBLA's authorized agent/affiliate) and the Telemarketing Defendants to engage customers directly.

<div align="center">115.</div>

The manner in which each Defendant participated in the affairs of the Enterprise and the perpetration of the scheme, along with the misconduct and basis of liability of each Defendant in the Enterprise, are previously set forth in detail in this Second Amended Complaint.

<div align="center">116.</div>

These participants that constitute the Enterprise were associated for, and share, the common purpose of fraudulently and illegally procuring insurance premiums and "membership fees" from consumers for worthless, junk insurance that was sold, marketed, and solicited by unlicensed producers as real, comprehensive individual health coverage. The Enterprise's purpose was to induce consumers to pay money in this regard. As alleged throughout this Complaint, the proceeds of the Enterprise were distributed to and among its participants, including those Defendants named herein.

117.

The facts and evidence described throughout this Complaint show that the Enterprise functions as a collective unit to perpetrate the scheme to defraud described herein. The Defendants are co-conspirators and rely on one another in a symbiotic relationship to perpetrate the scheme: NBLA (and its agents) needed and utilized an underwriter of some form of limited benefit insurance so it could market and sell coverage as comprehensive health insurance; USLIC needed and utilized a network to market and sell its worthless (yet profitable) limited benefits coverage; NBLA and USLIC needed and utilized a network of aggressive telemarketing companies to make "sales" at all costs; and so forth. The insurance scheme is perpetrated by the Defendants as a collective unit in conspiracy with one another. Each Defendant participated in the operation and conduct of the affairs of the Enterprise in the manner described throughout this Complaint, and benefitted monetarily from the operation of the Enterprise.

118.

The Enterprise affects interstate commerce in a variety of ways. The Enterprise utilizes interstate wires and mail to carry out its purpose and reap benefits for the Enterprise. The Defendants, as participants in the Enterprise, are located in different states and conduct the affairs of the Enterprise, including the insurance scheme

described in this action, on a national basis throughout the United States.

<div align="center">119.</div>

As previously alleged, the Enterprise has operated from at least December 2006 to the latter part of 2012 (as evidenced by the Georgia regulatory action) and, upon information, still operates to this day, as some victims of the scheme still pay money to NBLA for the "membership" and coverage, and unknowing victims continue to have claims submitted and denied.

<div align="center">120.</div>

At all relevant times, in violation of 18 U.S.C. §1962(c), the Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity as defined in RICO, 18 U.S.C. §1961(5). This pattern consists of more than two (2) acts of racketeering activity, the most recent of which occurred within ten (10) years after the commission of a prior act of racketeering activity.

<div align="center">121.</div>

The racketeering activity includes a related pattern of wire fraud and mail fraud in violation of 18 U.S.C. §§1341 and 1343.

<div align="center">122.</div>

Mail or wire fraud occurs when a person intentionally participates in a scheme to defraud another of money, and uses the mail or wires in furtherance of that scheme.

In this case, the United States mail and wires were, in fact, used to further the scheme described in this action. As previously alleged herein, deceptive webpages and television advertisements were utilized to steer and induce consumers, like Plaintiff, into the scheme; the mails were used in sending deceptive written materials, correspondence, purported "insurance cards," and other documents furthering the overall insurance scheme described herein; mail and wires were used to obtain money from consumers duped by the scheme, which the Defendants shared; and, of course, the systematic practice and use of telemarketers to make, and known by NBLA and USLIC to be making, widespread misrepresentations to consumers, including Plaintiff, about the coverage being sold (as described herein) is conduct constituting racketeering activity. The manner in which each Defendant engaged in this scheme to defraud and these racketeering activities is described throughout this Complaint.

<div align="center">123.</div>

The Defendants repeatedly utilized the United States mail and wires to carry out the scheme, and each Defendant could foresee and knew of the use of mails and wires in carrying out the scheme. For example, with NBLA's and USLIC's knowledge, telemarketers used telephone/wires to further and carry out the scheme to defraud with Plaintiff (*see* ¶¶70-71 herein) and with other victimized consumers, including the Montana victims, whose transactions are set forth in Exhibits A & B

attached hereto (*see* ¶¶44-48 herein; *see also* 28 & 36 of Exhibit B, demonstrating that wires/telephone were used in furthering the Montana victims' transactions). Likewise, mails were used in furtherance of the scheme, and the use of mails was foreseeable by all Defendants, as mails were used as to Plaintiff (*see* ¶79 herein, NBLA mails correspondence and insurance card; *see* ¶¶86-88 herein, American General - AIG mails letters regarding claims) and as to other victimized consumers, including the Montana victims (*see, e.g.,* ¶¶23, 29 & 38 of Exhibit B, demonstrating that mails were used in furthering the Montana victims' transactions). Mails and wires were, in fact, used by Defendants in carrying out the scheme to defraud, and were known by Defendants to be used, or foreseeable by Defendants to be used, by virtue of the agreements among them previously described herein.

<div align="center">124.</div>

Plaintiff was subjected to these predicate acts, as were other victimized consumers described in this action.

<div align="center">125.</div>

A pattern of racketeering activity is established if there have been at least two (2) acts of racketeering activity within the past ten (10) years. Here, the allegations of the Plaintiff, as well as other victimized consumers across the country referenced herein, demonstrate a pattern of racketeering activity played upon numerous

consumers in a series of transactions across the United States.  The racketeering activities played upon Plaintiff were also played upon numerous other consumers, as described and referenced in this Complaint.  The evidence regarding other victimized consumers referenced herein demonstrates the systematic pattern of these racketeering activities.  Further, these acts of racketeering activity are related to the same Enterprise whose objective is to obtain money from consumers who are sold junk insurance through deceptive and illegal means.

<p style="text-align:center">126.</p>

These acts of racketeering activity have the same method of commission in that they were the systematic way in which the Enterprise conducted its scheme to defraud.  In fact, these acts of racketeering activity were part of the regular way of doing business by the Defendants, as the pattern and series of transactions described in this action demonstrate.  The acts of racketeering activity have the same objective: obtaining monies and profits from consumers.  The acts of racketeering activity have similar victims, including consumers like Plaintiff and other class members who were seeking, and believed they were purchasing, real, comprehensive individual health insurance.  These acts of racketeering activity were designed and carried out to perpetrate racketeering with respect to a series of bogus sales - - - indeed, as many sales as the Defendants could possibly make to consumers across the country.  This

series of related racketeering activity began, upon information and belief, in December 2006.

127.

Through their nationwide scheme, the Defendants have committed thousands of violations of 18 U.S.C. §§1341 and 1343 as part of their pattern of racketeering activity.

128.

Each Defendant participated in the scheme to defraud knowingly, wilfully, and with a specific intent to defraud consumers into paying premiums and fees for worthless, junk insurance, which was deceptively marketed and sold.

129.

As a direct and proximate result of the Defendants' violations of 18 U.S.C. §1962(c), Plaintiff and the class have been injured in their business or property within the meaning of 18 U.S.C. §1964(c). Plaintiff and class members paid premiums and membership fees as a result of the scheme. Pursuant to 18 U.S.C. §1964(c), the Defendants are jointly and severally liable to Plaintiff and the class for three (3) times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## COUNT II
### Conspiracy to Violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(d)
### (Against All Defendants)

130.

Plaintiff adopts and incorporates ¶¶1 - 129 of this Complaint as if set out fully in this Count.

131.

Liability for a conspiracy to violate RICO can attach if the Defendant agreed to the overall objective of the conspiracy, or by showing the Defendant agreed to commit two (2) predicate acts. In this case, each Defendant named in this action agreed to the overall objective of the conspiracy. The objective of the conspiracy was to obtain monies from consumers by illegally and deceptively selling the subject junk coverage as comprehensive major medical coverage when it was not. Each Defendant agreed to the overall objective of this conspiracy in, upon information and belief, 2006. Upon information and belief, there was an illegal and direct agreement among the Defendants in this regard or, at a minimum, this agreement to the overall objective of the conspiracy can be inferred from the conduct of the Defendants that has been described in detail in this Complaint.

132.

Further, Defendants NBLA, USLIC, and the Telemarketing Defendants all made an illegal agreement by and among one another to conduct the pattern of wire fraud and mail fraud previously alleged and described. As previously alleged, NBLA and USLIC illegally conspired and agreed with one another to solicit, market and sell USLIC's coverage through deceptive means and with unlicensed producers as described herein, including through means which constitute wire fraud, and mail fraud.   Further, USLIC and NBLA illegally conspired and agreed with the Telemarketing Defendants named herein to conduct and allow unlicensed producers to sell the subject coverage on NBLA's and USLIC's behalf.   That is, USLIC and NBLA conspired and agreed with the Telemarketing Defendants to make sales of the subject coverage through unlicensed producers and through the aggressive, deceptive conduct described throughout this Complaint.   USLIC and NBLA conspired and agreed with the Telemarketing Defendants to commit the widespread wire fraud discussed herein played upon Plaintiff and other consumers across the United States. As previously alleged, the Telemarketing Defendants were acting as agents for NBLA and USLIC in deceptively and illegally marketing and selling the USLIC coverage.

133.

As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §1962(c), Plaintiff and the Class have been and are continuing to be injured in their business and property in an amount to be determined at trial. Such injuries included, but are not limited to, paying premium and fees with respect to the junk insurance as a direct, proximate and foreseeable result of the scheme alleged herein.

134.

Under the provisions of 18 U.S.C. §1964(c), Defendants are jointly and severally liable to Plaintiff and the class for three (3) times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

**PRAYERS FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court enter a judgment against Defendants and in favor of Plaintiff and the class and award the following relief:

a.    For an order declaring that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and for an order certifying this case as a class action and appointing Plaintiff as representative of the Class;

b.    For an order awarding compensatory damages on behalf of Plaintiff and the class in an amount to be proven at trial;

c.    For judgment for Plaintiff and the class on their claims in an amount to be proven at trial, for compensatory damages caused by Defendants' deceptive practices; along with exemplary damages to each class member for each violation;

d.    For judgment for Plaintiff and the class on their RICO claims, in an amount to be proven at trial, for three (3) times the amount of charges paid to Defendants by Plaintiff and the class;

e.    For pre-judgment and post-judgment interest as provided for by law or allowed in equity;

f.    For an order awarding Plaintiff and the class their attorneys' fees and costs; and

g.    Such other and further relief as may appear necessary and appropriate.

## JURY TRIAL DEMANDED

Pursuant to Federal Rules of Civil Procedure 38, Plaintiff demands a trial by jury of the claims alleged herein.


/s/ R. Brent Irby
R. Brent Irby

OF COUNSEL:
Charles A. McCallum, III
McCALLUM, HOAGLUND, COOK & IRBY, L.L.P.
905 Montgomery Highway
Suite 201
Vestavia Hills, Alabama 35216
Telephone: (205)824-7767
Facsimile: (205)824-7768
Email: birby@mhcilaw.com
        cmccallum@mhcilaw.com

## CERTIFICATE OF SERVICE

This is to certify that on July 29, 2014, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which automatically notifies counsel as follows:

Jeffrey M. Grantham
David P. Donahue
Lee E. Bains, Jr.
Lorrie L. Hargrove
Prim F. Escalona
MAYNARD, COOPER & GALE, P.C.
1901 Sixth Avenue North
2400 Regions/Harbert Plaza
Birmingham, Alabama 35203-2602
Telephone: (205)254-1000
*Attorneys for Defendant The United States Life Insurance Company in the City of New York*

Lewis E. Hassett
Patrick L. Lowther
MORRIS, MANNING & MARTIN, LLP
3343 Peachtree Road NE
Suite 1600
Atlanta, Georgia 30326
Telephone: (404)233-7000
*Attorneys for Defendant National Better Living Association, Inc.*

Clifton E. Slaten
SLATEN LAW PC
5960 Carmichael Place
Suite 200
Montgomery, Alabama 36117
Telephone: (334)396-8882
*Attorney for Defendant Albert Cormier Solutions, LLC*

National Healthcare Advisors, Inc.
c/o Roger W. Woods, Registered Agent
1301 E. Debbie Lane
Suite 102-42
Mansfield, Texas 76063


/s/ R. Brent Irby
COUNSEL